861 A.2d 898

COMMONWEALTH of Pennsylvania, Appellee,

v.

Lester FLETCHER, Appellant.

Supreme Court of Pennsylvania.

Submitted April 1, 2004.

Decided Nov. 18, 2004.

404

408

410

Douglas Lee Dolfman, Esq., Chestnut Hill, for Lester Fletcher.

Hugh J. Burns, Esq., Amy Zapp, Esq., Philadelphia, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice NEWMAN.

Lester Fletcher (Appellant) brings this direct appeal[1] from the Judgment of Sentence imposed by the Court of Common Pleas of Philadelphia County (trial court), which sentenced him to death following two convictions for first-degree murder.[2] After reviewing the claims raised by Appellant, we affirm the convictions and sentences of death.

## FACTS AND PROCEDURAL HISTORY

As part of our independent review of the record, we summarize the evidence presented at trial. On the evening of Friday, February 23, 2001, Appellant, and his friend, Bernard Mathis (Mathis), drove to the residence of David Otto (Otto), located at 2061 Orleans Street in the City of Philadelphia, to deliver a substantial quantity of crack cocaine. Otto, along with his girlfriend, Marlo Panvini (Panvini), rented the upstairs middle bedroom of the house from its owner, Kenneth Schofield (Schofield). On a regular basis, Appellant supplied Otto with crack cocaine, which Otto would then sell from inside the house.

After arriving at 2061 Orleans Street, Appellant and Mathis were informed that Otto was not home. While they waited for Otto to return, Appellant, Mathis, and several other individuals inside the house began smoking the crack cocaine that Appellant intended to deliver to Otto. These individuals included Kimberly Stinger (Stinger) and Kenneth Daehling (Daehl-

1. This Court has jurisdiction over direct appeals from a Judgment of Sentence in which the death penalty has been imposed. 42 Pa.C.S. § 9711(h).

2. 18 Pa.C.S. § 2502(a).

ing), who together rented the upstairs back bedroom of the house, Frank Mawson (Mawson), who sold crack cocaine for Otto and occasionally stayed at the house, and Schofield. By the following morning, Appellant and the others had completely consumed the crack cocaine that Appellant brought to the house.

When Otto returned the next day, he was annoyed to learn that Appellant and the others had consumed the entire delivery of crack cocaine. In his defense, Appellant responded that the crack cocaine belonged to him and that he could dispose of it how he pleased. Appellant then asked Otto to provide him and the others with additional crack cocaine to smoke. As a result of this inquiry, an argument erupted between Appellant and Otto. In the end, Otto agreed to supply Appellant and the others with more crack cocaine and, therefore, the group continued to smoke throughout the remainder of the day.

Later that day, several witnesses inside the house at 2061 Orleans Street observed Appellant with a pearl-handled .25 caliber pistol. The witnesses testified that, on several occasions, Appellant pulled out the handgun and displayed it to the other individuals in the house. In addition, Panvini, Stinger, Daehling, and Mathis testified that they observed Otto with a chrome .380 caliber pistol concealed in the waistband of his pants.

On Saturday evening, Appellant's wife, Lisa King (King), appeared at the house in search of her husband. To avoid detection by King, Appellant disappeared into the upstairs middle bedroom of the house with Panvini. While hiding, Appellant informed Panvini that he could not see King while high. Appellant also told Panvini, "I'm broke. I got to rob somebody. I can't go home broke to my old lady." (Notes of Testimony (N.T.), June 26, 2002, page 76). After being told by Schofield and Otto that Appellant was not at the house, King proceeded to wait for Appellant inside his car, which was parked along Orleans Street. King remained inside Appellant's vehicle for several hours; however, Appellant never left the house. Some time later, Otto and Mawson provided King with a ride home in Appellant's car. Once again, Appellant

and Mathis spent the night at 2061 Orleans Street, continuing to smoke crack cocaine into the early morning hours.

On the morning of Sunday, February 25, 2001, Appellant and Otto again became engaged in a heated argument over drugs. Appellant wanted Otto to supply him with more crack cocaine, or, in the alternative, with money to purchase additional crack cocaine. As the argument escalated, the men also quarreled as to the whereabouts of Appellant's car keys, which, according to Daehling, Otto had in his possession.[3] Also, both men bickered over bullets allegedly missing from Appellant's .25 caliber handgun.

Later that morning, Appellant and Mathis left the house at 2061 Orleans Street and went for a short drive in Appellant's car. As Appellant and Mathis drove for approximately ten minutes, the two men smoked the remainder of the crack cocaine that Otto had supplied the previous day. While in the car, Appellant told Mathis that "he couldn't go home to [his wife] broke; that he had to get some money." (N.T., June 27, 2002, page 173). Upon returning to Schofield's residence, Appellant parked his car and entered the house; meanwhile, Mathis lagged behind to smoke a cigarette.

Once inside the house, Appellant and Otto again became engaged in an intense argument over drugs. Shortly before 10:00 a.m., on February 26, 2001, the argument became stronger and gunshots erupted. First, Mawson testified, Appellant shot Otto at point-blank range with his .25 caliber handgun. Mawson further testified that Appellant then proceeded to shoot him in the head at point-blank range with the same .25 caliber pistol. Finally, Appellant shot Schofield in the head at close range with Otto's .380 caliber handgun.

Panvini and Daehling, who were both in the upstairs back bedroom at the time, testified that they heard three gunshots emanating from inside the house. Daehling testified that, after hearing the gunshots, he woke up Stinger so that the

3. The previous night, Otto told Appellant that Daehling had the keys to Appellant's car in his possession. However, after being confronted on the whereabouts of the car keys, Daehling informed Appellant that, in fact, Otto had the keys to Appellant's car.

three tenants could attempt to escape through the bedroom window. Instead of escaping, however, Panvini rushed downstairs to find Otto seated in a living room chair with a gunshot wound to the head. Panvini also noticed Mawson falling backwards with his hand pressed against his head. On the living room couch, Panvini observed the limp body of Schofield with a gunshot wound to the head. A short time later, Daehling and Stinger followed Panvini downstairs to see Otto with a bullet wound to the side of his head. At this point, Stinger called the police and Panvini reported the incident to the dispatch operator.

While waiting for the police to arrive at the scene, Panvini and Daehling searched Otto for potential drugs and money. Panvini testified that, prior to the shootings, Otto had $1,000.00 of personal money in his coat pocket, and $100.00 in proceeds from drug sales in his back pants pocket.[4] After searching Otto, however, Panvini discovered that the $1,000.00 was missing from Otto's coat pocket. Likewise, Panvini and Daehling noticed that Otto's .380 caliber handgun had been removed from the waistband of his pants. When Panvini and Daehling stepped outside of the house, they also noted that Appellant's car was no longer parked along Orleans Street.

Mathis testified that, no more than a few minutes after Appellant entered the house, he heard the sound of gunshots. Mathis further testified that, approximately five to ten minutes after watching Appellant enter the house, Appellant quickly exited the house "walking real fast" toward his car. (N.T., June 27, 2002, page 251). Appellant then instructed Mathis to "get in the car, don't say nothing." *Id.* at 178. Once inside Appellant's car, Mathis watched as Appellant stuffed a handgun into one pants pocket and a large bundle of cash into another. Appellant then proceeded to drive to a friend's house on Collom Street, which was near his own residence.

4. At trial, Panvini testified that Otto had a habit of keeping his drug money and personal money separate. According to Panvini, Otto was saving the $1,000.00 of personal money so that they could rent an apartment together in the near future.

Inside the house on Collom Street, Mathis observed Appellant count the money that he had previously stuffed in his pocket, which amounted to $1,000.00. Thereafter, Appellant's wife, King, arrived at the house. Mathis testified that Appellant informed King that "he just did a job" and that "the people in the house on Orleans Street were trying to hold us hostage." *Id.* at 184. Mathis testified that, moreover, Appellant was bragging to everyone in the house about the shootings, emphasizing that he had to "bust them mother-fuckers, leave no witnesses." *Id.* at 255. According to Mathis, Appellant instructed everyone in the house to "say nothing. You didn't see nothing." *Id.*

Within minutes after the shootings, police and rescue personnel responded to 2061 Orleans Street. When emergency personnel arrived, Otto and Mawson were still alive, but in serious condition. Both men were immediately transported to the hospital for further treatment. In the meantime, at 10:09 a.m., fire rescue medics pronounced Schofield dead at the scene. Later that same day, at 2:10 p.m., Otto was pronounced dead at the hospital. The cause of death for both victims was determined to be a single gunshot wound to the head. Remarkably, Mawson survived the gunshot wound to his head.[5]

After securing the scene at 2061 Orleans Street, the police investigated the house and found neither signs of a struggle nor signs of forced entry. In the living room area, the police recovered two .25 caliber fired cartridge casings and one .380 caliber fired cartridge casing. The police also found one .25 caliber live round and one .380 caliber live round in this same area. In addition, the police uncovered a note on an end table. The name "Manny," which is Appellant's acknowledged nickname, was transcribed on the piece of paper, along with the telephone number of Appellant's Collom Street residence. (N.T., June 26, 2002, pages 21–22).

The police also recovered bullet fragments from each of the victims. Specifically, .25 caliber bullet fragments were recov-

---

5. As a result of the severe trauma to his head, however, Mawson is now legally blind and requires the aid of others to perform menial tasks.

ered from the heads of Otto and Mawson, and a .380 caliber bullet fragment was recovered from the neck of Schofield. All three of the bullet fragments recovered from the individual victims were determined to be consistent with the fired cartridge casings found at 2061 Orleans Street.

On March 27, 2001, Appellant was arrested and charged with two counts of first-degree murder, attempted murder,[6] robbery,[7] possessing an instrument of crime (PIC),[8] and related offenses. On July 2, 2002, following a jury trial, Appellant was found guilty of two counts of first-degree murder for the killings of Otto and Schofield, attempted murder for the shooting of Mawson, robbery, and PIC.

On July 8, 2002, the trial court conducted a penalty phase hearing for sentencing Appellant on the two first-degree murder convictions. At the hearing, the Commonwealth presented the following three aggravating circumstances to the jury with respect to the murders of Otto and Schofield: (1) Appellant committed the killings while in the perpetration of a felony;[9] (2) in committing the offenses, Appellant knowingly created a grave risk of death to another person in addition to the victims;[10] and (3) Appellant has been convicted of another murder committed either before or at the time of the offenses at issue.[11] With respect to the murder of Schofield, the Commonwealth also presented a fourth aggravating circumstance to the jury, namely that Schofield was a prosecution witness to a murder or another felony committed by Appellant and was killed for the purpose of preventing his testimony against Appellant in any criminal proceeding involving such offense.[12] Appellant presented the following two mitigating circumstances: (1) his capacity to appreciate the criminality of

6. 18 Pa.C.S. § 901.

7. 18 Pa.C.S. § 3701.

8. 18 Pa.C.S. § 907.

9. 42 Pa.C.S. § 9711(d)(6).

10. 42 Pa.C.S. § 9711(d)(7).

11. 42 Pa.C.S. § 9711(d)(11).

12. 42 Pa.C.S. § 9711(d)(5).

his conduct or to conform his conduct to the requirements of the law was substantially impaired;[13] and (2) any other evidence of mitigation concerning his character and record and the circumstances of his offense (the catchall mitigator).[14]

The jury unanimously found the existence of the three aggravating circumstances presented with respect to the murder of Otto and the four aggravating circumstances presented as to the killing of Schofield. The jury also found the existence of one mitigating circumstance, namely that the capacity of Appellant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. On July 9, 2002, the jury unanimously determined that the aggravating circumstances outweighed the mitigating circumstance and, accordingly, sentenced Appellant to death for both counts of first-degree murder.

On August 22, 2002, the trial court formally imposed sentences of death for both murder convictions. The court also sentenced Appellant to: (1) a consecutive term of twenty to forty years' imprisonment for the attempted murder conviction; (2) a concurrent term of ten to twenty years' imprisonment for the robbery conviction; and (3) a consecutive term of two to five years' imprisonment for the PIC conviction. This timely direct appeal followed.

## DISCUSSION

### I. Guilt Phase

#### A. Sufficiency of the Evidence

■ Appellant first argues that the evidence presented during the guilt phase was insufficient to support his first-degree murder convictions. In particular, Appellant contends that his drug-induced intoxication at the time of the killings negated the specific intent to kill required to sustain a conviction for first-degree murder.

13. 42 Pa.C.S. § 9711(e)(3).
14. 42 Pa.C.S. § 9711(e)(8).

■ As an initial matter, this Court is required to review the sufficiency of the evidence to sustain a conviction for first-degree murder in every case in which the trial court imposes a sentence of death. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *rehearing denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). "When reviewing the sufficiency of the evidence, an appellate court must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt." *Commonwealth v. Weiss,* 565 Pa. 504, 776 A.2d 958, 963 (2001), *cert. denied,* 535 U.S. 1101, 122 S.Ct. 2303, 152 L.Ed.2d 1059 (2002).

■ A person is guilty of first-degree murder where the Commonwealth proves that the defendant acted with a specific intent to kill, a human being was unlawfully killed, the accused did the killing, and the killing was done with premeditation or deliberation. *Commonwealth v. Wesley,* 562 Pa. 7, 753 A.2d 204, 208 (2000); *Commonwealth v. Hall,* 549 Pa. 269, 701 A.2d 190, 196 (1997), *cert. denied,* 523 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998). *See also* 18 Pa.C.S. § 2502(a) and (d). The specific intent to kill is the element that distinguishes first-degree murder from the lesser degrees of murder. *Commonwealth v. Smith,* 548 Pa. 65, 694 A.2d 1086, 1088 (1997), *cert. denied,* 525 U.S. 847, 119 S.Ct. 118, 142 L.Ed.2d 95 (1998). The Commonwealth may prove the specific intent to kill with circumstantial evidence. *Weiss,* 776 A.2d at 963. For instance, the use of a deadly weapon on a vital part of a victim's body is sufficient to establish the specific intent to kill. *Commonwealth v. Bond,* 539 Pa. 299, 652 A.2d 308, 311 (1995).

■ In making his insufficiency argument, Appellant correctly notes that a showing of voluntary intoxication can negate the intent necessary for a conviction of first-degree murder and reduce the crime of murder from first to third degree. 18 Pa.C.S. § 308; *Commonwealth v. Marshall,* 534

Pa. 488, 633 A.2d 1100, 1104 (1993). However, the evidence presented at trial must show that the defendant was unable to form the specific intent to kill because he was so overwhelmed or overpowered by drugs to the point of losing his faculties at the time the crime was committed. *Marshall*, 633 A.2d at 1104–05. Moreover, whether a defendant's faculties and sensibilities were so overwhelmed with drugs so that he could not form the specific intent to kill is a question of fact solely within the province of the jury, who is free to believe any, all, or none of the testimony regarding intoxication. *Commonwealth v. Stoyko*, 504 Pa. 455, 475 A.2d 714, 720 (1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984) ("intoxication evidence, offered in an attempt to negate the intent necessary for a conviction for murder of the first degree, imposes no new burden on the Commonwealth and creates no new presumption for defendant which the Commonwealth must labor to overcome").

In the instant case, several witnesses presented by the Commonwealth detailed Appellant's extensive drug use preceding the deaths of Otto and Schofield. As a result, the trial court instructed the jury that "[v]oluntary intoxication or drug condition may reduce a crime of murder from first degree to third degree." (N.T., July 1, 2002, pages 137–38). By their verdict, however, the jury clearly did not believe that Appellant's voluntary intoxication prevented him from forming the specific intent required to support a first-degree murder conviction. As noted earlier, such credibility determinations are within the exclusive province of the jury to resolve in its role as the fact-finder. *Stoyko*, 475 A.2d at 720. Based upon the abundant evidence presented at trial, the jury could have reasonably found that Appellant acted with the requisite specific intent to kill.

Ultimately, the aforementioned evidence, and all reasonable inferences deducible therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, is more than sufficient to establish all of the elements of first-degree murder beyond a reasonable doubt. From the evidence presented at trial, the jury could have concluded that: (1) Otto

and Schofield were unlawfully killed; (2) Appellant shot both victims at point-blank range in the head; (3) Appellant acted with the specific intent to kill Otto and Schofield; and (4) Appellant acted with premeditation and deliberation. Accordingly, we find, as a matter of law, that the evidence was sufficient to convict Appellant on both counts of first-degree murder.

## B. Weight of the Evidence

 Appellant also asserts that the weight of the evidence militated against his first-degree murder convictions. A request for a new trial based upon a claim that the verdict was against the weight of the evidence will only be granted in the extreme situation where the jury's verdict is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Tharp*, 574 Pa. 202, 830 A.2d 519, 528 (2003), *cert. denied*, 541 U.S. 1045, 124 S.Ct. 2161, 158 L.Ed.2d 736 (2004) (citing *Commonwealth v. Brown*, 538 Pa. 410, 648 A.2d 1177, 1189 (1994)). Unless there are facts and inferences of record that disclose a clear abuse of discretion, an appellate court must refrain from reversing the ruling of a trial court that a verdict was not against the weight of the evidence. *Id.*

Given the evidence as outlined above, including the testimony of Mathis, the eyewitness testimony of Mawson, and the testimony of other individuals present at 2061 Orleans Street before and after the killings, it certainly cannot be said that the verdicts in this case shock one's sense of justice. Accordingly, we reject Appellant's contention that the jury's verdicts were against the weight of the evidence.

## C. Batson Challenge

 Appellant maintains that the trial court erred in failing to strike the jury panel because, during *voir dire*, the prosecution exercised its peremptory challenges to exclude African–Americans from the *venire* in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). According to Appellant, the Commonwealth used its peremptory challenges to strike six prospective African–American

jurors from the panel without providing a valid, race-neutral explanation for such strikes.

In *Batson*, the United States Supreme Court established that the Equal Protection Clause of the Fourteenth Amendment precludes the exercise of racially discriminatory peremptory challenges by the prosecution in state criminal trials. Most notably,

> *Batson* set[s] forth a three-part test for examining a criminal defendant's claim that a prosecutor exercised peremptory challenges in a racially discriminatory manner: first, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination.

*Commonwealth v. Harris*, 572 Pa. 489, 817 A.2d 1033, 1042 (2002), *cert. denied*, 540 U.S. 1081, 124 S.Ct. 939, 157 L.Ed.2d 756 (2003) (citing *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 728 (2000)).

To establish a *prima facie* case of purposeful discrimination pursuant to *Batson*, the defendant must show that: (1) he or she is a member of a cognizable racial group; (2) the prosecution exercised its peremptory challenges to remove from the *venire* members of such race; and (3) other relevant circumstances combine to raise an inference that the prosecution excluded the potential juror(s) for racial reasons. *Id.* A few years after its decision in *Batson*, the Supreme Court, in *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), modified the necessary elements for establishing a *prima facie* case so as to not require that the defendant and the excluded juror share the same racial identity. As such, the necessary *prima facie* case of purposeful discrimination may be established "by showing that the totali-

ty of the relevant facts gives rise to an inference of discriminatory purpose, for example, from a pattern of strikes against minority jurors included in the particular *venire* or from the manner of the prosecution's questions and statements during *voir dire* examination." *Basemore,* 744 A.2d at 729 (internal quotations and citation omitted).

"Where the presentation of a *prima facie* case of a *Batson* violation is called for, this Court has generally enforced a requirement of a full and complete record of the asserted violation, as it would otherwise be impossible to conduct meaningful appellate review of the motivations of prosecutors in individual cases, particularly when such review often occurs years after the trial." *Id. See also Commonwealth v. Holloway,* 559 Pa. 258, 739 A.2d 1039, 1045 (1999) ("[w]here an Appellant fails to make a record for review of a *Batson* challenge, this Court is unable to consider a claim that the trial court failed to find a *prima facie* case under *Batson* "). This full and complete record requirement necessitates that the defendant "make a record identifying the race of venirepersons stricken by the Commonwealth, the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury."[15] *Commonwealth v. Bronshtein,* 547 Pa. 460, 691 A.2d 907, 915 (1997), *cert. denied,* 522 U.S. 936, 118 S.Ct. 346, 139 L.Ed.2d 269 (1997).

**15.** Recently, in *Holloway v. Horn,* 355 F.3d 707 (3d Cir.2004), the United States Court of Appeals for the Third Circuit criticized our procedural requirement for the development of a full and complete record to establish a *prima facie* case of a *Batson* violation, concluding that such a requirement is "at odds with *Batson's* first step because it places a burden upon the defendant to make a record of largely irrelevant information in order to raise an inference that the prosecutor excluded members of the *venire* on account of race." *Holloway,* 355 F.3d at 729. Although we consider the decisions of the Third Circuit persuasive authority on matters of federal law, neither this Court nor the United States Supreme Court has explicitly overruled our long line of precedent that supports this requirement of a full and complete record of the asserted violation. *See Holloway,* 739 A.2d at 1045; *Bronshtein,* 691 A.2d at 915; *Commonwealth v. Simmons,* 541 Pa. 211, 662 A.2d 621, 631 (1995), *cert. denied,* 516 U.S. 1128, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996); *Commonwealth v. Spence,* 534 Pa. 233, 627 A.2d 1176, 1182–83 (1993).

Instantly, Appellant raised his *Batson* claim after the Commonwealth exercised its sixth peremptory challenge. At this point, Appellant made a record identifying the race of the six venirepersons stricken by the Commonwealth and the race of the three prospective jurors acceptable to the Commonwealth but stricken by the defense. However, Appellant failed to develop a full and complete record of the remaining venirepersons stricken by the Commonwealth and of those jurors acceptable to the Commonwealth but stricken by the defense. In addition, Appellant neglected to record the racial composition of the final jury. Because Appellant failed to make the requisite full and complete record for review of his *Batson* challenge, we cannot properly review the determination of the trial court that Appellant failed to establish a *prima facie* case of a *Batson* violation. Accordingly, Appellant is entitled to no relief on his claim of purposeful discrimination in the jury selection process pursuant to *Batson.*

## II. Penalty Phase

### A. *"Prosecution Witness" Aggravator*

Appellant alleges that the trial court erred in permitting the Commonwealth to present the "prosecution witness" aggravating circumstance to the jury during the penalty phase. In particular, Appellant argues that the evidence did not warrant the submission of this aggravator to the jury.

A trial court is required to instruct the jury on aggravating circumstances "as to which there is some evidence." 42 Pa.C.S. § 9711(c)(1)(i); *Commonwealth v. Drumheller,* 570 Pa. 117, 808 A.2d 893, 909 (2002), *cert. denied,* 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003); *Commonwealth v. Buck,* 551 Pa. 184, 709 A.2d 892, 896 (1998). Specifically, the "prosecution witness" aggravator provides that it is an aggravating circumstance if "[t]he victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses." 42 Pa.C.S. § 9711(d)(5). In *Commonwealth*

*v. Daniels,* 537 Pa. 464, 644 A.2d 1175 (1994) (per curiam), the Court explained that:

A finding of the existence of the aggravating circumstance set forth in § 9711(d)(5) requires proof that the victim was killed to prevent his testimony in a pending grand jury or criminal proceeding. The existence of this particular aggravating circumstance may be found, absent a pending criminal proceeding, only where the facts establish by direct, rather than circumstantial evidence, that the killing resulted from the intention to eliminate a potential witness. This burden will not be met by simply showing that an individual who witnessed a murder or other felony committed by a defendant was also killed by the defendant.

*Daniels,* 644 A.2d at 1179 (internal citations omitted). *See also Commonwealth v. Fisher,* 559 Pa. 558, 741 A.2d 1234, 1239–40 (1999), *cert. denied,* 531 U.S. 829, 121 S.Ct. 81, 148 L.Ed.2d 43 (2000) ("[i]n interpreting [the (d)(5)] aggravating factor, we have determined that it encompasses the killing of a potential witness, even when there is no criminal proceeding pending at the time of the murder, if the killer's intention to eliminate the victim as a potential witness is established through direct evidence").

Here, the Commonwealth presented direct evidence that Appellant killed Schofield to prevent him from testifying as a witness against Appellant for the murder and robbery of Otto. In particular, the Commonwealth offered the testimony of Mathis, who accompanied Appellant to a friend's house shortly after the shootings. Notably, Mathis testified that:

[Appellant] was telling everybody in the house what he did. He was sort of bragging he said, and I quote, it's in quotes, he said quote: He had the [sic] **bust them mother-fuckers, leave no witnesses,** close quotes. He told us quote don't say nothing. You didn't see nothing, end quote.

(N.T., June 27, 2002, page 255) (emphasis added). Appellant's admission that he had to "bust them mother-fuckers, leave no witnesses," which was made shortly after the shootings and overheard by Mathis, established by direct evidence that Appellant killed Schofield to eliminate him as a potential

witness. Based upon this direct evidence, the trial court did not err in submitting the "prosecution witness" aggravator to the jury.[16] *See Commonwealth v. Strong*, 522 Pa. 445, 563 A.2d 479, 484 (1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1536, 108 L.Ed.2d 775 (1990) (defendant's statement to accomplice during robbery that he was "tired of leaving witnesses behind" constituted sufficient direct evidence to establish "prosecution witness" aggravator); *Commonwealth v. Appel*, 517 Pa. 529, 539 A.2d 780, 783–84 (1988) (defendant's admission that he tried to kill all of the individuals inside a bank during a robbery so as to not leave any potential witnesses constituted sufficient direct evidence to establish "prosecution witness" aggravator).

 Nonetheless, Appellant maintains that "numerous inconsistencies in Mr. Mathis' testimony did not merit the submission of the ['prosecution witness'] aggravating circumstance to the jury." Brief for Appellant at 20. However, any inconsistencies in the testimony of Mathis went to the weight to be accorded such evidence, which is exclusively for the finder of fact, who is free to believe all, part, or none of the evidence in determining the credibility of the witness. *See Commonwealth v. Johnson*, 542 Pa. 384, 668 A.2d 97, 101 (1995), *cert. denied*, 519 U.S. 827, 117 S.Ct. 90, 136 L.Ed.2d 46 (1996). Therefore, contrary to the position of Appellant, any inconsistencies in Mathis' testimony did not render the evidence insufficient to necessitate that the trial court disallow the submission of the prosecution witness aggravator. *See Commonwealth v. Small*, 559 Pa. 423, 741 A.2d 666, 672 n. 6 (1999), *cert. denied*, 531 U.S. 829, 121 S.Ct. 80, 148 L.Ed.2d 42 (2000) ("it is well established in this Commonwealth that a mere conflict of testimony does not render the evidence insufficient") (internal quotations omitted).

16. The Commonwealth also sought to present the "prosecution witness" aggravator as to the killing of Otto. However, the trial court refused to submit this aggravating circumstance to the jury because "[t]he evidence showed that there were other motivations for the killing of Mr. Otto, as evidenced by the arguments between Mr. Otto and [Appellant] that preceded the murder." Trial Court Opinion, September 16, 2002, at 19.

### B. "Perpetration of a Felony" and "Multiple Murder" Aggravators

■ Appellant also argues that the jury's consideration of the "perpetration of a felony" and "multiple murder" aggravating circumstances violated his state and federal constitutional rights. More specifically, Appellant claims that submission of these aggravators was improper because they violate the Double Jeopardy Clauses of the Pennsylvania and United States Constitutions. Appellant's argument, however, is without merit.

■ As an initial matter, we note that the double jeopardy protections afforded by the United States and Pennsylvania Constitutions are coextensive and prohibit successive prosecutions and multiple punishments for the same offense. *Commonwealth v. Cosnek*, 575 Pa. 411, 836 A.2d 871, 873 n. 2 (2003); *Commonwealth v. Buffington*, 574 Pa. 29, 828 A.2d 1024, 1029 (2003). In *Commonwealth v. Gibbs*, 533 Pa. 539, 626 A.2d 133 (1993), this Court explained:

Aggravating circumstances are not separate penalties or offenses, but are standards to guide the making of the choice between the alternative verdicts of death and life imprisonment. The judge's finding of any particular aggravating circumstance does not of itself convict a defendant (i.e. require the death penalty), and the failure to find any particular aggravating circumstance does not acquit a defendant (i.e., preclude the death penalty).

*Gibbs*, 626 A.2d at 136 (quoting *Poland v. Arizona*, 476 U.S. 147, 156, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986)). Because this Court has recognized that aggravating circumstances do not constitute separate penalties or offenses, no double jeopardy rights were implicated by the submission of the "perpetration of a felony" and "multiple murder" aggravating circumstances to the jury.

■ In addition, Appellant asserts that the "multiple murder" aggravating circumstance violates the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. "In the con-

text of a challenge to the breadth of an aggravator, to survive an Eighth Amendment challenge 'an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' " *Commonwealth v. Johnson*, 572 Pa. 283, 815 A.2d 563, 588–89 (2002) (quoting *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)). The "multiple murder" aggravator provides that it is an aggravating circumstance if "[t]he defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue." 42 Pa.C.S. § 9711(d)(11). As worded, this aggravating circumstance clearly narrows the class of persons eligible for the death penalty by excluding those individuals who have not been convicted of another murder. Moreover, the "multiple murder" aggravator reasonably justifies the imposition of a more severe sentence because, based upon their risk of danger to general society, those individuals convicted of multiple murders warrant a harsher punishment. As such, the "multiple murder" aggravator comports with the necessary requirements of the Eighth Amendment and the Due Process Clause. *See Commonwealth v. Cross*, 508 Pa. 322, 496 A.2d 1144, 1153–54 (1985) (finding that the (d)(10) aggravating circumstance, which includes the circumstances of multiple murders, is not "arbitrary and capricious"). Accordingly, Appellant's constitutional claims fail.

## C. Statistics on Commutation

▆▆▆▆ Appellant contends that the trial court erred in refusing to include, in its charge to the jury at the penalty phase, statistics on the commutation of life imprisonment sentences in the Commonwealth over the preceding years. In crafting this argument, Appellant relies upon the plurality decision of this Court in *Commonwealth v. Trivigno*, 561 Pa. 232, 750 A.2d 243 (2000) (opinion announcing the judgment of the court). In *Trivigno*, the lead Opinion stated:

We now hold that when a *Simmons* instruction [17] is required because the prosecution has argued the defendant's future dangerousness, the trial court ... should inform the jury that a life sentence means that a defendant is not eligible for parole, but that the Governor has the power to grant a commutation of a sentence of life or death if based on the recommendation of the Board of Pardons following a public hearing. Further, the trial court should relay any available statistical information relating to the percentage of life sentences that have been commuted within the last several years.

*Trivigno,* 750 A.2d at 255–56 (footnote added). Appellant maintains that, because the Commonwealth argued the issue of his future dangerousness during the cross-examination of his mother and at closing argument, the jury should have been instructed on the statistics of commutation.

During the penalty phase hearing, the prosecutor inquired into whether Appellant's mother was aware of her son's prior convictions for robbery and assault. According to Appellant, the Commonwealth elicited this testimony as a means of arguing Appellant's future dangerousness. However, this Court has consistently recognized that evidence regarding a defendant's **past** violent convictions or conduct does not implicate the issue of his or her **future** dangerousness. *Commonwealth v. Champney,* 574 Pa. 435, 832 A.2d 403, 417 (2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004); *Commonwealth v. May,* 551 Pa. 286, 710 A.2d 44, 47 (1998), *cert. denied,* 525 U.S. 1078, 119 S.Ct. 818, 142 L.Ed.2d 676 (1999). As such, absent a showing that the Commonwealth argued the Appellant's future dangerousness, a "statistics on commutation" instruction was not warranted.

Nevertheless, the trial court informed penalty phase defense counsel: "Well, if you have those statistics [on commutation] and you know that they're certified, I'd be happy to give them...." (N.T., July 8, 2002, page 27). In response, defense

17. A *Simmons,* or "life means life," instruction directs the jury that a sentence of life imprisonment does not permit parole. *See Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

counsel dismissed the invitation, instead arguing that the Commonwealth carried the burden to provide the relevant statistical information. However, nothing in *Trivigno* infers that the Commonwealth carries the burden of providing statistics on commutation. Because Appellant failed to provide the trial court with any available and reliable statistical information regarding commutation, it was not error for the trial court to offer an instruction devoid of the statistics.

Eventually, the standard jury instruction given by the trial court clearly stated that:

> If a life prisoner can convince the Board of Pardons that his or her sentence should be commuted, that is, made shorter and the Board of Pardons recommends this to the governor, the governor has the power to shorten the sentence. If the governor follows the Pardon Board's recommendation and commutes the sentence, the prisoner may be released early or become eligible for parole in the future.

> I'll tell you that the governor and Board of Pardons rarely commute a sentence of life imprisonment. You can assume that whenever they do so, they will act responsibly and will not commute the sentence of a life prisoner whom they believe to be dangerous.

(N.T., July 8, 2002, pages 170–71). Even absent statistical information on the commutation of life imprisonment sentences in the Commonwealth, the aforementioned jury instruction, when read in its entirety, was proper. Accordingly, Appellant's claim warrants no relief.

### D. Motion to Set Aside Jury Verdict

■■ Appellant contends that the trial court erred in denying his Motion to Set Aside the death sentences. Appellant asserts that the jury's death verdict should have been set aside because the aggravating and mitigating circumstances were not announced from the jury box and, therefore, the individual jurors were not provided the opportunity to be polled as to their findings. This assertion, however, is without merit.

Following the announcement of the two death sentence verdicts by the jury foreperson, the jurors were individually polled as to their agreement with the verdicts. Thereafter, the court excused the jury and proceeded to read into the record, from the sentence verdict slips, the particular aggravating and mitigating circumstances found by the jury. At this point, defense counsel moved to set aside the verdicts. In response, the following exchange occurred:

**THE COURT:** Well, they were polled as to the sentence, number one. And number two, those findings are recorded. They are actually written down. The jury is still here. If you wish, I can bring them out and make sure that they all agree with the verdict slips as written. I have no problem doing that. Do you wish me to do that?

**MR. SCOTT [defense counsel]:** No, Your Honor.

(N.T., July 9, 2002, pages 26–27). As quoted above, the trial court offered to resolve Appellant's claim of error by polling the jurors in open court as to their findings. Despite this offer, Appellant expressly refused. Therefore, Appellant is barred from seeking redress for an alleged claim of error that he patently refused to rectify before the trial court.

Regardless, the Commonwealth's death penalty statute contains no requirement that aggravating and mitigating circumstances must be announced orally from the jury box and that jurors must be individually polled regarding their findings. *See generally* 42 Pa.C.S. § 9711. Here, the trial court dismissed the jury and read their collective findings into the record from the verdict slips. Accordingly, the trial court did not err in failing to take the redundant step of orally polling the jurors from the jury box as to their findings.

### E. Prior Convictions

Appellant argues that the trial court erred in allowing the Commonwealth to cross-examine his mother during the penalty phase regarding his prior criminal convictions. Appellant insists that the trial court improperly permitted the Commonwealth to introduce his prior convictions as evidence of his bad character and propensity to commit criminal acts.

As a general matter, Pennsylvania Rule of Evidence 404(a) pronounces a broad prohibition on using evidence of an accused's bad character to establish "action in conformity therewith" during a criminal proceeding. Nonetheless, pursuant to Pa.R.E. 404(a)(1), an accused may choose to offer evidence of his or her good character. In order to prove this trait of good character, the accused may opt to introduce evidence of his or her reputation among associates or within a particular community. Pa.R.E. 405(a). However, if the accused offers such reputation evidence, the Commonwealth is permitted to cross-examine the character witness regarding "specific instances of conduct probative of the character trait in question...." *Id.*

Here, on direct examination during the penalty hearing, the following dialogue occurred between defense counsel and Appellant's mother, Allene Jones (Jones):

**Q:** Why don't you tell the jury, why you don't think [Appellant] ought to get the death penalty. Tell them, don't tell me.

**A:** I don't think that he was really that type of person. Whatever happened on that day, it was just something I guess was just beyond control, because **he's really not that type of person to go around and harming people.** I'm sorry that it had to happened [sic], that it happened like that. What can I do?

(N.T., July 8, 2002, pages 48–49) (emphasis added).[18] In response, on cross-examination, the prosecutor questioned Jones regarding her knowledge of particular acts of misconduct by Appellant to test the accuracy of her reputation evidence. More specifically, the following exchange occurred between the prosecutor and Jones:

**Q:** You made a statement to your jury that your son really is not that the [sic] type of person?

**A:** No, he's not.

---

18. Insofar as Appellant refers to the testimony of Jones as constituting evidence of his good character within the community, this testimony was not admitted for that purpose and the issue of whether this was proper reputation testimony is not presently before this Court.

**Q:** You're aware of your son's prior conviction for robbery?

**A:** No.

**Q:** You're aware of his three prior convictions for assault?

**A:** Well, I know of one.

(N.T., July 8, 2002, pages 50–51).

Initially, we note that "[t]he scope of cross-examination is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion." *Commonwealth v. Gibson,* 547 Pa. 71, 688 A.2d 1152, 1167 (1997), *cert. denied,* 522 U.S. 948, 118 S.Ct. 364, 139 L.Ed.2d 284 (1997). This Court has consistently repeated the principle that "although evidence of good character may not be rebutted by evidence of specific acts of misconduct, a character witness may be cross-examined regarding his or her knowledge of particular acts of misconduct by the defendant to test the accuracy of his or her testimony and the standard by which he or she measures reputation." *Commonwealth v. Busanet,* 572 Pa. 535, 817 A.2d 1060, 1069 (2002), *cert. denied,* 540 U.S. 869, 124 S.Ct. 192, 157 L.Ed.2d 126 (2003); *Commonwealth v. Smith,* 539 Pa. 128, 650 A.2d 863, 866 (1994), *cert. denied,* 514 U.S. 1085, 115 S.Ct. 1799, 131 L.Ed.2d 726 (1995); *Commonwealth v. Peterkin,* 511 Pa. 299, 513 A.2d 373, 382–83 (1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). By presenting reputation evidence as to his character for peacefulness and non-violence, Appellant "opened the door" for the Commonwealth to cross-examine his character witness regarding specific instances of conduct probative of the character trait in question. Pa.R.E. 405(a). As a result, the Commonwealth was entitled to cross-examine Jones concerning her degree of knowledge of Appellant's character. *Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 702 n. 10 (1998) ("[w]here the defense presents evidence of the defendant's reputation for peacefulness, the prosecution is permitted to test that testimony by inquiry into whether the witness is aware of convictions which tend to refute that reputation").

Therefore, the scope of the cross-examination by the Commonwealth was proper.

■■■ Regardless, after defense counsel objected to this line of questioning, the trial court prohibited the Commonwealth from further questioning Jones as to any of Appellant's prior convictions. At this same time, the trial court further instructed the jury to disregard the Commonwealth's questions regarding Appellant's prior convictions. Pursuant to Pa.R.E. 403, "evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading to the jury . . . ." In the case *sub judice*, the trial court elected to estop the Commonwealth from pursuing its line of questioning "out of an abundance of caution." Trial Court Opinion, September 16, 2002, page 26. Although the Commonwealth's questions on cross-examination were proper, the trial court sustained Appellant's objection to the line of questioning and issued a curative instruction so as to ensure that Appellant was not unduly prejudiced. As such, the trial court did not err in granting Appellant relief where none was necessary under the circumstances.

## F. Prosecutorial Misconduct

As a final claim, Appellant asserts that the trial court erred in denying his Motion to Dismiss after the prosecutor, during penalty phase closing argument, made allegedly improper and prejudicial remarks to the jury. In particular, Appellant contends that the prosecutor improperly referenced his character and prior record in his closing argument, thereby prejudicing the minds of the jury. Moreover, Appellant claims that the jury was further prejudiced by the prosecutor's comments on his alleged lack of remorse for the crimes committed.

■■■ At the outset, we note that "[c]omments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict. Further, when considering [an a]ppel-

lant's claims of prosecutorial misconduct, it must be noted [that] a prosecutor's comments do not constitute evidence." *Commonwealth v. Stokes*, 576 Pa. 299, 839 A.2d 226, 230 (2003) (internal citations and quotations omitted).

During the penalty phase of a capital case, where the presumption of innocence no longer applies, the Commonwealth is afforded reasonable latitude in arguing its position to the jury and may employ oratorical flair in arguing for the death penalty. *Commonwealth v. Basemore*, 525 Pa. 512, 582 A.2d 861, 869 (1990), *cert. denied,* 502 U.S. 1102, 112 S.Ct. 1191, 117 L.Ed.2d 432 (1992). "There is nothing improper in the prosecutor arguing the appropriateness of the death penalty because that is the only issue before the jury at the penalty phase of the trial." *Stokes,* 839 A.2d at 233 (quoting *Commonwealth v. Dennis,* 552 Pa. 331, 715 A.2d 404, 415 (1998)). The prosecutor may properly respond to evidence presented by the defendant to prove mitigating circumstances. *Basemore,* 582 A.2d at 869. Moreover, "[a] prosecutor may urge the jury to disfavor the defense's mitigation evidence in favor of imposing the death penalty." *Stokes,* 839 A.2d at 233.

In the present matter, Appellant presented the catchall mitigator to the jury. The catchall mitigator allows a defendant to offer "any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S. § 9711(e)(8). In support of this catchall mitigator, Appellant presented the testimony of his mother and sister concerning his good character and reputation. Thereafter, during closing argument, the prosecutor responded to this mitigation evidence by stating:

When you're considering the character and background and record of the defendant, consider his demeanor, his composure, his actions, his conduct and his behavior in this courtroom during this trial, how he acted his behavior on the morning of this murder. There's been absolutely no remorse, no contrition, no sorrow.

(N.T., July 8, 2002, pages 114–15). In light of Appellant's presentation of the catchall mitigator, such comments by the

prosecutor were permissible. These comments were appropriately made in response to mitigation evidence presented by Appellant and, therefore, did not unduly prejudice the jury so that they could not weigh the evidence objectively and render a true verdict.

Nevertheless, Appellant claims that, within the above-quoted statement, the prosecutor improperly commented on his lack of remorse. However, it is well established that:

[T]he demeanor of a defendant, including his apparent remorse, is a proper factor to be considered by a jury in the sentencing phase of a capital case. Recognizing that the sentencing phase of trial has a different purpose than the guilt determination phase, and that the privilege against self-incrimination and the presumption of innocence has no direct application to the latter phase, this Court has held that comment upon a defendant's failure to show remorse is permitted at least where the comment does not amount to an extended tirade focusing undue attention on the factor of remorse.

*Commonwealth v. Rice,* 568 Pa. 182, 795 A.2d 340, 358 (2002) (opinion announcing the judgment of the court), *cert. denied,* 538 U.S. 926, 123 S.Ct. 1571, 155 L.Ed.2d 319 (2003) (quoting *Commonwealth v. Lester,* 554 Pa. 644, 722 A.2d 997, 1009 (1998)). Despite this Court's pronouncements in *Rice, Lester,* and numerous other prior decisions that a defendant's right against self-incrimination has no application to the penalty phase of a capital trial, we have recently recognized that, in the context of the right to remain silent, this constitutional privilege is applicable to the penalty phase of capital trials. *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385, 410 (2003) (citing *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981)). However, contrary to the position of Appellant, the prosecutor's isolated comments did not inappropriately implicate Appellant's constitutional right to remain silent. In responding to Appellant's introduction of the catch-all mitigating circumstance, the prosecutor briefly commented that the jury should consider Appellant's lack of remorse. In

making these remarks, the prosecutor in no way inferred or implied that Appellant had a duty to testify. Instead, the prosecutor explicitly limited his remorse comments to Appellant's non-verbal demeanor and behavior during trial and on the morning of the murders. Moreover, in order to ensure that the jury would not draw an adverse inference from Appellant's failure to testify, the trial court provided the following instruction in its final charge:

Also, jurors, I want to remind you that the defendant has an absolute right founded on the Constitution to remain silent and, again, you must not draw any adverse inference whatsoever from the fact that the defendant did not testify.

(N.T., July 8, 2002, pages 146–47). Given that the comments by the prosecutor were in response to Appellant's introduction of the catchall mitigator and did not imply a duty on the part of Appellant to testify, the trial court did not err in denying Appellant's Motion to Dismiss. *See Commonwealth v. Clark*, 551 Pa. 258, 710 A.2d 31, 40 (1998), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1465, 143 L.Ed.2d 550 (1999) (holding no violation of the defendant's Fifth Amendment right against self-incrimination where "[t]he comments were not clearly intended to create in the minds of the jury an adverse inference from the defendant's failure to testify as to the substance of the underlying charges; the comments were a reference to the demeanor of the witness and the testimony he presented as to his character").

## CONCLUSION

We conclude that none of the claims of error raised by Appellant warrant relief. The evidence was sufficient to support the aggravating circumstances found by the jury in imposing the death penalty.[19] Moreover, after a thorough review of the record, we have determined that the sentences of death were not the product of passion, prejudice, or any factor that was improper. Accordingly, we affirm the sentences of death imposed upon Appellant by the Court of Common Pleas of Philadelphia County. Pursuant to 42 Pa.

**19.** *See* 42 Pa.C.S. § 9711(h)(4).

C.S. § 9711(i), we direct the Prothonotary of the Supreme Court of Pennsylvania to transmit, within ninety days, the complete record of this case to the Governor of Pennsylvania.

Justice SAYLOR files a concurring opinion.

Justice SAYLOR, concurring.

I concur in the majority's disposition of Appellant's claims and write only to express my position respecting the claim of alleged discriminatory practices on the part of the prosecution in jury selection.

In this regard, the majority initially concludes that Appellant has not established a *prima facie* case under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), because he failed to comply with this Court's full and complete record requirement, deriving from *Commonwealth v. Spence,* 534 Pa. 233, 627 A.2d 1176 (1993). Although the majority acknowledges that the United States Court of Appeals for the Third Circuit has held that the *Spence* requirements are an unreasonable application of federal law, it declines to reconsider them, since neither this Court nor the United States Supreme Court have overruled our precedent. *See* Majority Opinion, Op. at 910 n. 15 (citing *Holloway v. Horn,* 355 F.3d 707, 728–29 (3d Cir.)), *cert. denied, Beard v. Holloway,* 73 USLW 3266, 125 S.Ct. 410 (2004). I have, however, previously expressed my agreement with the Third Circuit's approach, at least in the context of Appellant's circumstance, namely, a direct appeal from a trial court's refusal to cognize a timely objection asserting a *prima facie Batson* violation. *See Commonwealth v. Uderra,* 580 Pa. 492, 513 n. 12, 862 A.2d 74, 86 n. 12, 2004 WL 2363725 (2004) (footnote attributed to this author only).[1] My position aligns with that of the majority in relation to the application of the *Spence* requirements to Appellant's

1. In the direct appeal setting, obligating a defendant to identify the race of the jurors who served and the race of the jurors acceptable to the Commonwealth who were stricken by the defense is at odds with *Batson,* as,

> [t]he final composition of the jury (or even the composition of the jury at the time the *Batson* objection is raised) offers no reliable indication of whether the prosecutor intentionally discriminated in excluding a member of the defendant's race. Indeed, the composition of a jury is

situation solely because he has not undertaken to challenge them in this appeal.[2]

decided by many factors, including the defendant's use of peremptory challenges, challenges for cause, and jurors' claims of hardship. Thus, a *Batson* inquiry focuses on whether or not racial discrimination exists in the striking of a black person from the jury, not on the fact that other blacks may remain of the jury panel. A defendant can make a prima facie case of discrimination without reference to the jury's racial makeup.

Likewise, evidence of the race of jurors acceptable to the Commonwealth who were stricken by the defense finds no place in the prima facie case, as defense strikes are irrelevant to the determination of whether the prosecutor has engaged in discrimination. *Batson* nowhere suggests that a defendant must support his challenge to the prosecutor's actions by showing that he has clean hands, or by admitting that he too struck black jurors from the jury....

*Holloway,* 355 F.3d at 728–29 (citations and internal quotations omitted). I would therefore not reject a *Batson* claim on direct appeal based on the Appellant's failure to develop information extraneous to that necessary to establish an inference of discrimination.

As *Uderra* explained, however, the reasoning in *Holloway* is less persuasive in connection with an ineffectiveness claim stemming from the failure to lodge a *Batson* challenge at trial. *See Uderra,* 580 Pa. at 511–13, 862 A.2d at 86. In that situation, requiring either a full and complete record, or proof of actual, purposeful discrimination, is consistent with the burden under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546, and/or the ineffectiveness standard. *See id.* at 513–15, 862 A.2d at 87.

**2.** Under *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), any ineffectiveness dynamic pertaining to any failing on the part of Appellant's counsel relative to the *Spence* requirements is a subject for post-conviction review.