J-S95039-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| DAVID REYES, | : | |
| | : | |
| Appellant | : | No. 371 EDA 2015 |

Appeal from the Judgment of Sentence January 9, 2015
in the Court of Common Pleas of Philadelphia County,
Criminal Division, No(s): CP-51-CR-0001249-2013

BEFORE: STABILE, MOULTON and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:        **FILED FEBRUARY 14, 2017**

David Reyes ("Reyes") appeals from the judgment of sentence imposed after a jury convicted him of first-degree murder, firearms not to be carried without a license, carrying a firearm on public streets in Philadelphia, and possessing an instrument of crime.[1]  We affirm.

The trial court thoroughly set forth in its Opinion the factual history underlying this appeal, which we adopt as though fully recited herein.  *See* Trial Court Opinion, 10/23/15, at 2-9.

In January 2015, the matter proceeded to a jury trial, at the close of which the jury found Reyes guilty on all counts.  The trial court then imposed an aggregate sentence of life in prison without the possibility of parole.  Reyes timely filed a Notice of Appeal.  In response, the trial court ordered

---

[1] *See* 18 Pa.C.S.A. §§ 2502(a), 6106(a)(1), 6108, 907(a).

Reyes to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Reyes timely filed a Concise Statement.

Reyes presents the following issues for our review:

I. Did the trial court err in not allowing [a] defense expert to give his opinion that [Reyes] acted under a sudden and intense passion resulting from serious provocation by the victim[,] because this issue of voluntary manslaughter was raised by the evidence and the [defense] witness … was a registered psychologist[,] who was qualified by the court to testify as an expert?

II. Did the trial court err in not giving an instruction on voluntary manslaughter[,] in that [Reyes] acted under a sudden and intense passion resulting from serious provocation by the victim[,] when this issue of voluntary manslaughter was raised by the evidence in this case?

III. Did the trial court err in not giving an instruction on voluntary intoxication or drugged condition as a defense to first[-]degree murder[,] when [Reyes] introduced evidence on this issue?

IV. Did the trial court err in not giving the jury a charge on diminished capacity that reduce [*sic*] first[-]degree murder to third[-]degree murder[,] when evidence was presented at trial on this issue?

Brief for Appellant at 2.

In his first issue, Reyes argues that the trial court committed reversible error when it precluded the defense from presenting opinion testimony from defense witness Alan Tepper, J.D., Psy.D. ("Dr. Tepper"),[2] that Reyes had shot the victim under a sudden and intense passion resulting from serious provocation by the victim (hereinafter "the proposed heat of

---

[2] The trial court qualified Dr. Tepper as an expert in psychology.

passion expert testimony"). *See id.* at 8. Reyes asserts that the following facts were sufficient to raise the issue of reducing the first-degree murder charge to voluntary manslaughter, and thus allow for introduction of the proposed heat of passion expert testimony:

> [T]he victim said to [Reyes] ["]fuck your mother[,"] and when [Reyes] told the victim that his mother just died[,] the victim provoked [Reyes], who[m,] the evidence showed[,] was in an extremely bad mental state, by saying again to him ["]fuck your mother[,"] and laughing about the victim[']s acquittal for [Reyes's] nephew's sexual assault case. If this provocation had not happened[,] would there have been a homicide[?] The opinion of Dr. Tepper would have said no ….

*Id.* at 11; *see also id.* at 10, 11 (asserting that "Dr. Tepper was going to testify that d[ue] to the state of mind of [Reyes,] the actions of the decedent were a trigger for voluntary manslaughter," and "at the time of the incident[, Reyes] was acting and reacting in a state of intense and sudden passion provoked by the victim."). Reyes contends that "[w]ords alone can be sufficient provocation for voluntary manslaughter[.]" *Id.* at 11 (citing *Commonwealth v. Berry*, 336 A.2d 262 (Pa. 1975)).

In its Pa.R.A.P. 1925(a) Opinion, the trial court thoroughly discussed the applicable law and standard of review, and determined that it properly excluded the proposed heat of passion expert testimony, as there was no factual basis for a jury instruction on voluntary manslaughter. *See* Trial Court Opinion, 10/23/15, at 13-18. The trial court's sound rationale and determination is amply supported by the law and the record, and we

therefore affirm on this basis in rejecting Reyes's first issue, **see id.**, with the following addendum.

Reyes's characterization of our Supreme Court's holding in **Berry**, **supra**, is inaccurate. In that case, the defendant's mother and her male neighbor engaged in a verbal altercation, during which the mother spat at the neighbor, and he responded by striking her, knocking her to the ground. **Berry**, 336 A.2d at 235. Upon hearing his mother's scream, the defendant came immediately to the scene and observed his mother on the ground, whereupon she informed him of the assault. **Id.** Five minutes later, the defendant forced his way into the neighbor's home and fatally wounded the man. **Id.** The Supreme Court held that the trial court had erred in giving an inaccurate jury instruction on the provocation necessary to establish voluntary manslaughter, stating that,

> [w]hile the *words of an insulting and scandalous nature are not sufficient cause of provocation*, words conveying information of a fact[,] which constitutes adequate provocation when that fact is observed[,] would constitute sufficient provocation. The threatened or immediate infliction of serious injury upon a parent, spouse or child[,] because of the relationship of the parties and the expected concern of one for the well[-]being of the other, has occasioned courts to hold this conduct may be sufficient provocation to reduce the killing to voluntary manslaughter. We are constrained to hold that the trial court misled the jury in suggesting that the provocation could not be found to be legally sufficient in absence of a finding that the son actually witnessed the assault upon the mother.

**Id.** at 264 (emphasis added; internal citations and paragraph break omitted). To the contrary, as the trial court properly determined in the

- 4 -

instant case, the victim's actions fell well short of the provocation necessary for voluntary manslaughter, as "[Reyes] was only subjected to insults of a non-threatening nature." Trial Court Opinion, 10/23/15, at 16 (citing *Berry*).

We next address Reyes's remaining three issues simultaneously, as they all allege trial court error in its refusal to give three jury instructions requested by the defense: voluntary manslaughter; voluntary intoxication or drugged condition; and diminished capacity (hereinafter collectively referred to as "the requested jury instructions"). In his second issue, Reyes contends that a jury instruction on voluntary manslaughter was warranted under the facts (and the expert opinion of Dr. Tepper), as discussed in connection with Reyes's first issue above. *See* Brief for Appellant at 12-16. According to Reyes, this evidence met the three-prong test for establishing voluntary manslaughter set forth in *Commonwealth v. McCusker*, 292 A.2d 286 (Pa. 1972). Brief for Appellant at 15.

In his third issue, Reyes argues that a jury instruction on voluntary intoxication was warranted where

> [Reyes] introduced eviden[ce] that he was under the influence of the drugs of Percocet and Xanax at the time of the incident[; Reyes's] sister testified that she saw him the day before the incident and [Reyes] was out of it[; Reyes] introduced expert testimony that [he] had a binging behavior [] with drug abuse of Opiate and Ben[z]odiazepine drugs[; and Reyes] testified that he blanked out during the incident and had no memory of it.

*Id.* at 16.

Finally, Reyes avers that a jury instruction on diminished capacity was warranted where Reyes had presented evidence that he suffered from a mental disorder that prevented him from formulating a specific intent to kill. *Id.* at 19. Reyes concedes that his psychological expert, Dr. Tepper, "did state an opinion ... [that] one could not come to the conclusion that [Reyes] acted with or without specific intent to kill." *Id.* at 22. Reyes urges that, nevertheless, the trial court should have issued an instruction on diminished capacity, as "the evidence raised the issue of diminished capacity because [Reyes] does not have to prove diminished capacity but must raise it in the evidence[.]" *Id.*; *see also id.* (asserting that "there was other evidence introduced by the defense that [Reyes] was suffering from a mental disorder or abnormality[,] which came from [the testimony of Reyes] and [Reyes's] sister.").

The trial court addressed Reyes's claims in its well-reasoned Opinion, thoroughly discussed the applicable law and standard of review, and determined that the court did not err in declining to give the requested jury instructions. *See* Trial Court Opinion, 10/23/15, at 18-25. The trial court's sound rationale and determination is supported by the law and the record, and we therefore affirm on this basis as to Reyes's three remaining issues. *See id.*; *see also id.* at 14-18 (discussing the law on voluntary manslaughter).

Judgment of sentence affirmed.

- 6 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/14/2017

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
CRIMINAL TRIAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | CP-51-CR-0001249-2013 |
| | : | |
| | : | |
| v. | : | SUPERIOR COURT |
| | : | |
| | : | |
| DAVID REYES | : | 371 EDA 2015 |

**OPINION**

Byrd, J.                                                                October 23, 2015

After a jury trial commencing on January 6, 2015, defendant David Reyes was convicted of first-degree murder and related offenses on January 9, 2015. Immediately after entry of the jury's verdict, defendant was sentenced to life imprisonment without the possibility of parole and an aggregate concurrent imprisonment term of eight and one-half (8 ½) to seventeen (17) years. On February 2, 2015, defendant filed a notice of appeal. This court ordered defendant to file a statement of matters complained of on appeal on February 17, 2015, and said statement was filed on February 24, 2015.

FILED

OCT 23 2015

Criminal Appeals Unit
First Judicial District of PA

## STATEMENT OF FACTS

On May 9, 2012, at approximately 5:34 p.m., defendant shot and killed Samuel Rivera at the victim's place of employment, Jiffy Lube at 3658 Aramingo Avenue. Prior to this shooting, defendant and Mr. Rivera had argued about the victim's relationship with defendant's sister Jacqueline Reyes and her son E.C. At trial, Ms. Reyes testified that she had a relationship with Mr. Rivera that began in 1996 and ended in 2003 because Mr. Rivera was allegedly abusive to her and her family. In 2008, defendant accused Mr. Rivera of sexually abusing E.C. These accusations led to criminal charges against Mr. Rivera, who was arrested and later acquitted. N.T. 01/06/15, pp. 54-87, 114-138; N.T. 01/07/15, pp. 5-36; N.T. 01/08/15, pp. 9-34, 40-110, 116-199.

Before fatally shooting Mr. Rivera defendant had walked to the Jiffy Lube with a concealed weapon and engaged Mr. Rivera in an argument wherein he again accused Mr. Rivera of sexually assaulting defendant's minor nephew E.C. According to defendant, Mr. Rivera then referenced his acquittal of those charges during the following exchange between the two men:

> **Mr. Rivera:** "Not guilty, not guilty, ah ha, ah ha, not guilty, that's why I'm not guilty, you mad, you mad."
>
> **Defendant:** "You a pedophile, you like to touch kids." He also stated, "You a faggot and a bitch and you like to touch kids."
>
> **Mr. Rivera:** "Oh, your fucking mother is a bitch."
>
> **Defendant:** "What did you say?"
>
> **Mr. Rivera:** "Oh, fuck your mother."
>
> **Defendant:** "My mother just died."
>
> **Mr. Rivera:** "Fuck your mother, not guilty, not guilty, ah ha, ah ha."

During this exchange Mr. Rivera was inside a vehicle brought in for service. Mr. Rivera began to point and yell at defendant and scream for someone to call police. As he continued to yell, defendant pulled a handgun from his waistband and shot Mr. Rivera at least six (6) times. After

*Commw. v. David Reyes* ß Page 2 of 25

the shooting, defendant walked away from the Jiffy Lube. He walked up an alleyway and then onto Tulip Street, where he tossed his gun holster, black jacket, and ear buds. N.T. 01/06/15, pp. 54-87, 114-138; N.T. 01/07/15, pp. 5-36; N.T. 01/08/15, pp. 9-34, 116-199.

William Nash, another Jiffy Lube employee, heard Mr. Rivera yelling for someone to call police and dialed 911. Mr. Nash later gave two statements to police and identified defendant from a photograph as the shooter. Mr. Nash also stated that defendant was wearing a white sleeveless tee shirt and pants and was carrying a hoodie. Derrick and Shanta Wilson and their sixteen-year-old daughter Jazmyn Edwards were inside their vehicle and exiting a shopping center parking lot when they witnessed the murder. They heard several gunshots and saw defendant shooting into a vehicle at the Jiffy Lube. Mr. Wilson did not see defendant's face, but he observed that defendant was close to the vehicle and that the gun barrel was about one foot and one-half (1 ½) to two (2) feet away from the driver's side. Mr. Wilson followed defendant to Tulip Street while Mrs. Wilson called police. Mr. Wilson and his family later returned to the scene and told police the direction they observed defendant traveling. Later that day, Mr. and Mrs. Wilson and their daughter provided statements to Homicide Unit detectives. Because Jazmyn Edwards saw the shooter's face, homicide detectives visited the Wilson home the next day and interviewed her a second time. At this second interview, she circled defendant's photograph and identified him as the shooter. N.T. 01/06/15, pp. 114-138; N.T. 01/07/15, pp. 5-36.

When Police Officer Jason Smaron arrived on the scene at 5:40 p.m., he observed decedent inside the vehicle with his legs on the driver's side and his waist and torso leaning over the console toward the front passenger seat. At approximately 5:56 p.m., Mr. Rivera was pronounced dead at Temple University Hospital. Officer Smaron canvassed the area after

receiving the following description of the shooter: "[w]hite shirt, black pants, possibly the brand Dickies, and a black hoodie." On May 10, 2012, Dr. Gary Collins performed the autopsy on Mr. Rivera's body and prepared a report of his findings. At trial, Dr. Collins testified as an expert in forensic pathology. He concluded to a reasonable degree of medical certainty that the cause of death was multiple gunshot wounds and that the manner of death was homicide. Dr. Collins noted that Mr. Rivera suffered six (6) gunshot wounds, three (3) of which were fatal due to significant internal bleeding caused by the bullets striking vascular structures and major vital organs. One gunshot wound caused immediate paralysis. A toxicology report indicated that Mr. Rivera had recently used cocaine due to its presence in his urine. However, Dr. Collins opined that the cocaine was not a contributing factor to Mr. Rivera's death. N.T. 01/06/15, pp. 100-112; N.T. 01/08/15, pp. 9-34.

Dr. Collins stated that Mr. Rivera's injuries were primarily on his left side, consistent with him being in the driver seat when shot. The gunshot wounds sustained by the victim were also consistent with Mr. Rivera being shot initially and then turning his back in an attempt to move away from the bullets, only to sustain additional gunshot wounds. Dr. Collins further concluded to a reasonable degree of medical certainty that the absence of soot or stippling on Mr. Rivera's body or clothing indicated that the gun barrel was at least two and one-half (2 ½) to three (3) feet away from the victim when the gun was fired. N.T. 01/07/15, pp. 9-34.

At about 7:00 p.m., Police Officer Ronald Sirianni responded to the crime scene and took photographs of the evidence subsequently recovered. He observed two (2) garage bays at the Jiffy Lube; one was closed and the other was open with a blue Ford Focus parked in front. There was blood on the bottom front door of this vehicle and the front and rear passenger side doors were closed. Officer Sirianni found six (6) fired cartridge casings on the left side of the vehicle.

He later submitted them to the Firearms Identification Unit. After processing the crime scene, Officer Sirianni walked around the corner where he recovered a black gun holster from the side yard of 3547 Tulip Street. He also found a large black Adidas zip-up jacket and a pair of white Sony ear buds on the side yard of 3531 Tulip Street. These items had been tossed by defendant after the murder. N.T. 01/06/15, pp. 54-87; N.T. 01/07/15, pp. 67-69.

The vehicle was transported to the police garage. Police Officer Michael Maresca inspected the vehicle and did not find any exit marks or strike marks on the passenger side of the vehicle. He did find three (3) strike marks on the driver side. Trajectory rods were placed inside these strike marks to determine the path of the bullets. The trajectory rods showed that the shooter was close to the vehicle and that the gunshots were fired into the vehicle in a downward fashion on the driver's side. One of the trajectory rods was placed into the front door frame on the driver's side door. This trajectory rod indicated that one of the bullets traveled through the door and into the decedent's body. Officer Maresca also found two (2) projectiles after cutting the front seats open. One projectile was found inside the front driver seat and was defective due to it striking an object. The other projectile was found inside the front passenger seat. This projectile was not defective. In addition to finding these two (2) projectiles, Officer Maresca found a pair of black rubber work gloves on the passenger seat and a vehicle work receipt. He also observed blood on the passenger side. At trial, the parties stipulated that defendant did not have a valid license to carry a firearm or a valid sportsman firearm permit. Police Officer Raymond Andrejczak, an expert in firearms identification, examined the projectiles and concluded to a reasonable degree of scientific certainty that they were all fired from the same nine millimeter firearm. N.T. 01/06/15, pp. 88-99; N.T. 017/07/15, pp. 67-70; N.T. 01/08/15, pp. 35-36.

Detective James Dunlap testified as an expert in forensic video recovery and played a videotape compilation of activity occurring at or around 5:30 p.m. from three (3) locations. The first location was at the Jiffy Lube at 3658 Aramingo Avenue. The second location was a Wendy's at 3600 Aramingo Avenue. The third location was A2Z Auto at 3577 Tulip Street. The first videotape footage showed defendant walking southbound on Aramingo Avenue toward the Jiffy Lube garage on May 9, 2012, at 5:31:45 p.m. He then exited the camera view. The same footage showed decedent exit the Jiffy Lube garage and walk out of the camera view. When decedent returned to the camera view, he walked in and out of the Jiffy Lube garage. The decedent then entered a parked car and interacted with someone who was out of the camera view. At 5:34:40, the video showed defendant's extended arm. The footage from the Wendy's videotape showed defendant's extended arm with a gun in his hand. The videotape from A2Z Auto showed defendant wearing a white shirt and carrying a jacket as he entered and ran out of the camera view. N.T. 01/06/15, pp. 139-155.

Detective Dunlap also testified as an expert in cellular survey analysis and geolocation. He examined defendant's Cricket cellular phone, number 267-600-4358, for May 9, 2012 for the timeframe of 5:37:59 to 5:56:47. Detective Dunlap found that a cellular phone call had been made forty (40) minutes before this timeframe. During the approximate twenty (20) minute timeframe, there were at least six (6) calls made from this cellular phone number. The first cellular phone call after the murder occurred at 17:37:59 and was made to Mauricio Oscar Latorre. This call lasted one minute and sixteen seconds and occurred about one minute and one-half after defendant exited the camera view of the videotape compilation. Detective Dunlap stated that the Jiffy Lube was within the geographic coverage area and that defendant's phone was found to be within the general vicinity of that area. N.T. 01/07/15, pp. 37-52.

At trial, Crime Scene Unit Police Officer Brian Stark presented a diagram, based upon the videotape compilation. It displayed an enlarged downward view of the area from the Sleepy's store at 3664 Aramingo Avenue to the Monro Muffler store at 3650 Aramingo Avenue. Officer Stark chose three landmarks as reference points of the areas that were shown on the videotape and timed defendant's walking pace between each landmark. The first landmark was the Sleepy's store, where defendant was observed at the store's property line at 4:33:19. The second landmark was the Jiffy Lube driveway entrance at 4:33:43. Officer Stark determined that the distance between the first landmark and the second landmark was seventy-four (74) feet and that defendant's walking pace on Aramingo Avenue was about .32 seconds per feet. The third landmark was the Jiffy Lube garage, where the decedent first exited at 4:34:14. This landmark was at about fifty-seven and one-half (57 ½) feet away from the sidewalk in front of the Jiffy Lube. Officer Stark determined that the distance between the second and third landmark was ninety-four (94) feet, about one hundred and thirty (130) feet from the camera view. Defendant continued at the same pace and in the same direction when decedent exited the Jiffy Lube garage. N.T. 01/07/15, pp. 71-88.

Detective Sean Mellon from the Fugitive Squad was assigned to locate defendant. On May 23, 2012, a warrant was prepared for defendant's arrest, and Detective Mellon went to defendant's residence and to the homes of defendant's sisters, Diane Reyes and Jacqueline Reyes. Defendant was not found at any of those addresses. On that same day, defendant's sister Yvette Reyes contacted the U.S. Marshals and agreed to meet Detective Mellon at defendant's residence. Yvette Reyes informed Detective Mellon that all of defendant's belongings were gone. She also gave him defendant's cell phone number. On May 25, 2012 Detective Mellon went to yet another address but he did not find defendant at that location. On May 30, 2012

Detective Mellon spoke with Yvette Reyes a second time. He also spoke to Cory Torres and to Mauricio Oscar Latorre, who gave a statement. In addition to searching for defendant at those addresses, Detective Mellon used the Real Time Crime Center on June 1, 2012 and placed defendant's photograph in the Philadelphia Daily News on June 4, 2012. Detective Mellon also returned to the homes of Diane Reyes and Jacqueline Reyes and talked to them a second time. On June 10, 2012, Detective Mellon received an anonymous tip that defendant was at a specific address in Jacksonville, Florida. On June 12, 2012 defendant was arrested and later extradited to Philadelphia. At the time of his arrest, defendant was not forthcoming with his identity. N.T. 01/07/15, pp. 52-66.

At trial, defendant admitted to shooting decedent. However, despite decedent's relationship with his sister, Jacqueline Reyes, defendant denied knowing that Mr. Rivera worked at the Jiffy Lube. Defendant also denied walking to the Jiffy Lube to hunt down decedent. He claimed to be in that area after deciding to "go for a long walk" to Castor and Aramingo Avenues and that he was carrying a concealed and unlicensed gun for self-defense. Defendant further claimed that he did not realize that he had shot decedent because he "blanked out" and had no control over himself when decedent made those comments about his mother, who had recently died on April 12, 2012. Defendant testified that he had taken several Percocet and Xanax pills on the day before the murder and that he was experiencing a hangover from these drugs at the time of the shooting. He also claimed to feel a mixture of emotions that he did not know how to handle at the time of the murder. Defendant's sister, Yvette Reyes, stated that she knew defendant was abusing Percocet and Xanax pills. She stated that defendant was "out of it" and was not making any sense to her when she saw him on the day before the murder. Defendant further admitted to fleeing the scene and to calling Mauricio Oscar Latorre to tell him what

happened. Defendant stated that a friend transported him to Florida, where he stayed with a cousin before he was located and apprehended. N.T. 01/07/15, pp. 52-66; N.T. 01/08/15, pp. 116-199.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

Defendant raised the following issues in his Statement of Matters Complained of on Appeal, in accordance with Pennsylvania Rule of Appellate Procedure 1925(b):[1]

1. The evidence was insufficient to establish *mens rea* for first degree murder. The Commonwealth did not establish beyond a reasonable doubt that the defendant acted with specific intent to kill.

2. The trial court erred in not allowing the defense expert to testify before the jury and opine that the defendant acted in a heat of passion. See NT 1-8-15. @201-209.

3. The trial court erred in not giving an instruction to the jury on voluntary manslaughter (heat of passion following serious provocation).

4. The trial court erred in not giving an instruction to the jury on the diminished capacity defense as to first degree murder.

5. The trial court erred in not giving an instruction to the jury on voluntary intoxication or drugged condition as to first degree murder.

6. The defendant reserves the right to modify, amend, or supplement this statement.

## DISCUSSION

Defendant first contends that there was insufficient evidence to establish that he committed first-degree murder. In evaluating whether the evidence was sufficient to sustain a conviction, the appellate court "must view the evidence in the light most favorable to the Commonwealth as verdict winner, accept as true all the evidence and all reasonable inferences

---

[1] The following is a verbatim account of defendant's Statement.

upon which, if believed, the jury could properly have based its verdict, and determine whether such evidence and inferences are sufficient in law to prove guilt beyond a reasonable doubt." *Commonwealth v. Tate*, 485 Pa. 180, 182, 401 A.2d 353, 354 (1979). In applying this test, "the entire record must be evaluated and all evidence actually received must be considered." *Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa. Super. 2001) (quoting *Commonwealth v. Hennigan*, 753 A.2d 245, 253 (Pa. Super. 2000)). In *Commonwealth v. McKeithan*, 504 A.2d 294, 299 (Pa. Super. 1986), the court noted that "[a] person may be convicted on the basis of circumstantial evidence alone if reasonable inferences arising therefrom prove the fact in question beyond a reasonable doubt." In reviewing a sufficiency of the evidence claim, "it is not necessary that each piece of evidence be linked to the defendant beyond a reasonable doubt. It is only necessary ... that the combination of evidence link the defendant to the crime beyond a reasonable doubt." *Commonwealth v. Sullivan*, 472 Pa. 129, 150, 371 A.2d 468, 478 (1977).

In *Commonwealth v. Costa-Hernandez*, 802 A.2d 671, 675 (Pa. Super. 2002), the court recognized that the "question of any doubt regarding the facts and circumstances established by the Commonwealth is for the fact-finder to resolve unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." The appellate court may not weigh the evidence and substitute its judgment for the fact-finder. *Commonwealth v. Taylor*, 831 A.2d 661 (Pa. Super. 2003). Further, "it is for the fact finder to make credibility determinations, and the finder of fact may believe all, part, or none of a witness's testimony." *Commonwealth v. Mack*, 850 A.2d 690, 693 (Pa. Super. 2004). Moreover, "[t]he Commonwealth is entitled to every inference reasonably arising from the evidence" that it has presented. *Commonwealth v. Figueroa*, 456 Pa. 381, 384, 321 A.2d 658, 659 (1974).

To convict a person of first-degree murder, "the Commonwealth must demonstrate that the defendant acted with malice and a specific intent to kill, that a human being was unlawfully killed, that the defendant committed the killing, and that the killing was intentional, deliberate and premeditated." *Commonwealth v. Chamberlain*, 612 Pa. 107, 129, 30 A.3d 381, 394 (2011), *cert. denied*, 132 S.Ct. 2377 (2012). *See also* 18 Pa. C.S. §2502(a), (d). In *Commonwealth v. Hare*, 486 Pa. 123, 129, 404 A.2d 388, 391 (1979), the court explained that "[m]alice will be found if the actor committed a killing with an intent to kill[.]" Specific intent to kill "may be found from a defendant's words or conduct and may be inferred from the intentional use of a deadly weapon on a vital part of the body of another human being." *Commonwealth v. Agie*, 449 Pa. 187, 190, 296 A.2d 741, 742 (1972). *See also Commonwealth v. Arrington*, 624 Pa. 506, 522, 86 A.3d 831, 840 (2014), *cert. denied*, 135 S. Ct. 479 (2014) (holding that "[s]pecific intent and malice may be established through circumstantial evidence"). In *Commonwealth v. Mason*, 559 Pa. 500, 741 A.2d 708 (1999), *cert. denied*, 531 U.S. 829 (2000), the court explained that "premeditation and deliberation exist 'whenever there is a conscious purpose to bring about death.' " *Id.*, 559 Pa. at 510, 741 A.2d at 713 (quoting *Commonwealth v. O'Searo*, 466 Pa. 224, 240, 352 A.2d 30, 37 (1976)).

At trial, the Commonwealth introduced evidence that defendant approached the decedent, pulled out a gun, and shot him at least six times. As a result, decedent suffered six gunshot wounds, three of which were fatal due to significant internal bleeding caused by the bullets striking vascular structures and major vital organs. In *Commonwealth v. Alston*, 458 Pa. 412, 416, 317 A.2d 229, 231 (1974), the court reasoned that "[t]he use of a deadly weapon directed at a vital organ of another human being justifies a factual presumption that the actor intended death unless the testimony contains additional evidence that would demonstrate a contrary intent."

Indeed, "it is well-established in Pennsylvania law that the specific intent to kill can be formed in a fraction of a second, and may be found whenever the defendant acts with a conscious purpose to bring about the death of the victim." *Commonwealth v. Chambers*, 602 Pa. 224, 245, 980 A.2d 35, 47 (2009), *cert. denied*, 560 U.S. 928 (2010). Here, defendant used a gun to repeatedly shoot and kill an unarmed person who was inside a vehicle in public and in broad daylight. Clearly, defendant's conduct was premeditated and deliberate.

Defendant's conduct further established that he possessed malice and a specific intent to kill the decedent at the time of the shooting. *See Commonwealth v. Bond*, 539 Pa. 299, 305, 652 A.2d 308, 311 (1995) (noting that a gun is "clearly a deadly weapon"); *Commonwealth v. Solano*, 588 Pa. 716, 736, 906 A.2d 1180, 1192 (2006), *cert. denied*, 550 U.S. 938 (2007) (noting that one of the factors that "weighs in on the element of intent" is "the precise distance from which the bullets were fired"); *Commonwealth v. Rodgers*, 500 Pa. 405, 409, 456 A.2d 1352, 1354 (1983) (ruling that "a shotgun blast to the head at short range" establishes the specific intent to kill); *Commonwealth v. Davis*, 491 Pa. 363, 421 A.2d 179 (1980) (holding that the Commonwealth established specific intent to kill through evidence that defendant shot unarmed victim); *Commonwealth v. Chine*, 40 A.3d 1239, 1242 (Pa. Super. 2012) (holding that evidence of defendant shooting an "unsuspecting, unarmed victim" was a clear indication of specific intent to kill). In addition to the Commonwealth's evidence, defendant testified at trial and admitted to shooting decedent. In light of these facts, the jury could reasonably conclude that defendant committed this killing with intention, deliberation, and premeditation.

Moreover, defendant's flight from the crime scene and to another state was evidence of his consciousness of guilt. Immediately after shooting the decedent, defendant walked away from the scene and hid from police. He was later located and apprehended in Florida. *See*

*Commonwealth v. Harvey*, 514 Pa. 531, 538-539, 526 A.2d 330, 334 (1987) (concluding that "if a person has reason to know he is wanted in connection with a crime, and proceeds to flee or conceal himself from the law enforcement authorities, such evasive conduct is evidence of guilt and may form a basis, in connection with other proof, from which guilt may be inferred"). When viewed in the light most favorable to the Commonwealth, there was sufficient evidence presented at trial that proved beyond a reasonable doubt that defendant committed first-degree murder.

Defendant next asserts that this court erred in excluding defense expert testimony regarding whether or not he acted in the heat of passion at the time of the killing. Prior to trial, Dr. Allan Tepper conducted a psychological evaluation of defendant and prepared an expert report that included his findings and conclusions regarding defendant's mental state. At trial, this court admitted Dr. Tepper's expert testimony relating to defendant's diminished capacity defense and voluntary intoxication defense. However, this court excluded Dr. Tepper's expert testimony on whether or not defendant acted in the heat of passion because there was no foundation for a jury instruction on voluntary manslaughter. In *Commonwealth v. Miller*, 627 A.2d 741, 748-749 (Pa. Super. 1993), the court explained that "[t]he decision to admit or exclude expert testimony lies within the sound discretion of the trial court [and] the determination of the trial court will not be reversed unless an abuse of that discretion is found to exist." In ruling on the admissibility of such evidence, "the trial court must decide whether the evidence is relevant and, if so, whether its probative value outweighs its prejudicial effect." *Commonwealth v. Hawk*, 551 Pa. 71, 77, 709 A.2d 373, 376 (1998).

This court did not abuse its discretion in excluding expert testimony on whether or not defendant acted in the heat of passion. Indeed, expert testimony "is admissible in all cases, civil

and criminal alike, 'when it involves explanations and inferences not within the range of ordinary training knowledge, intelligence and experience.' " *Commonwealth v. Walker*, 625 Pa. 450, 486, 92 A.3d 766, 788 (2014) (quoting *Commonwealth v. Leslie*, 424 Pa. 331, 334, 227 A.2d 900, 903 (1967)). *See also* Pa. R. Evid. 702. Indeed, the court has also held that "psychiatric evidence, coming as it does from a 'recognized and important branch of modern medicine,' should be admissible at trial for the purpose of determining whether a defendant acted in the heat of passion." *Commonwealth v. McCusker*, 448 Pa. 382, 387-388, 292 A.2d 286, 289 (1972). However, "[a]s with all expert opinion … it is essential that the salient facts relied upon as the basis for the opinion be in the record." *Commonwealth v. Paskings*, 447 Pa. 350, 355-356, 290 A.2d 82, 85 (1972). Stated another way, "[a]n expert's testimony is admissible when it is based on facts of record and will not cause confusion or prejudice." *Commonwealth v. Watson*, 945 A.2d 174, 176 (Pa. Super. 2008). *See also Commonwealth v. Blasioli*, 685 A.2d 151, 167 (Pa. Super. 1996) (ruling that "only expert testimony which assists the jury is admissible").

Defendant was not entitled to expert testimony on whether or not he acted in the heat of passion because there was no factual basis for a jury instruction on voluntary manslaughter. The crime of voluntary manslaughter "involves a killing in a sudden and intense passion resulting from a serious provocation or an unreasonable belief in self-defense." *Commonwealth v. Cox*, 546 Pa. 515, 539, 686 A.2d 1279, 1291 (1996), *cert. denied*, 522 U.S. 999 (1997). Voluntary manslaughter "is an appropriate verdict for 'heat of passion' killings, where, 'at the time of the killing, [the defendant] acted under sudden and intense passion [due to] serious provocation by the victim.' " *Commonwealth v. Kim*, 888 A.2d 847, 853 (Pa. Super. 2005) (quoting *Commonwealth v. Frederick Thomas*, 552 Pa. 621, 640, 717 A.2d 468, 477 (1998), *cert. denied*, 528 U.S. 827 (1999)). Specifically, heat of passion includes "emotions such as anger, rage,

sudden resentment or terror, which renders the mind incapable of reason." *Commonwealth v. Speight*, 544 Pa. 451, 467, 677 A.2d 317, 324-325 (1996), *cert. denied*, 519 U.S. 1119 (1997), *and abrogated on other grounds by Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003), *cert. denied*, 543 U.S. 822 (2004).

In *Commonwealth v. Copeland*, 554 A.2d 54, 57 (Pa. Super. 1988), the court explained that "[t]he passion which will reduce an unlawful killing to voluntary manslaughter must be caused by legally adequate provocation." The law "is quite explicit that the determination of whether a certain quantum of provocation is sufficient to support the defense of voluntary manslaughter is purely an objective standard." *McCusker*, 448 Pa. at 389, 292 A.2d at 289. In determining whether there was serious provocation, one must consider " 'whether a reasonable [person] confronted by the same series of events, would become impassioned to the extent that his mind would be incapable of cool reflection.' " *Kim*, 888 A.2d at 853 (quoting *Commonwealth v. Galloway*, 485 A.2d 776, 783 (Pa. Super. 1984)).

In *Commonwealth v. Busanet*, 618 Pa. 1, 34, 54 A.3d 35, 55 (2012), *cert. denied*, 134 S.Ct. 178 (2013), the court clarified that "both passion and provocation must be established" before a killing is considered voluntary manslaughter. That was not the case here. There was no support for defendant's argument that he acted under a sudden and intense passion resulting from serious provocation by defendant. During their argument, decedent referred to his acquittal on charges surrounding prior allegations that he sexually abused defendant's nephew. Mr. Rivera also made offensive remarks about defendant's deceased mother. Obviously, defendant was sensitive about these issues. He may have also harbored some anger or resentment toward decedent given their past contentious history. Nevertheless, the evidence does not establish that a reasonable person confronted with these circumstances would have become so impassioned

that he would have been incapable of cool reflection. *See, e.g., Commonwealth v. Whitfield*, 475 Pa. 297, 380 A.2d 362 (1977) (rejecting the decedent's prior sexual molestations of the defendant at a young age as evidence of adequate legal provocation); *Commonwealth v. Martin*, 607 Pa. 165, 5 A.3d 177 (2010), *cert. denied*, 131 S.Ct. 2960 (2011) (concluding that the decedent's sexual advances toward the defendant may have triggered the defendant's post-traumatic flashback of childhood sexual abuse, but it did not render defendant incapable of cool reflection). In *Commonwealth v. Dews*, 429 Pa. 555, 559, 239 A.2d 382, 385 (1968), the court held that a defendant cannot acquire a voluntary manslaughter verdict "by recalling some past injury or insult."

There is also no evidentiary support for the contention that defendant was seriously provoked by the decedent. First, there was no evidence that decedent struck or physically harmed defendant prior to or at the time of the murder or on any other occasion. The record shows that defendant was only subjected to insults of a non-threatening nature. *See, e.g., Commonwealth v. Berry*, 461 Pa. 233, 238, 336 A.2d 262, 264 (1975) (acknowledging that sufficient provocation may exist when the words convey "[t]he threatened or immediate infliction of serious injury upon a parent, spouse or child"). As the court held in *Berry*, "words of an insulting and scandalous nature are not sufficient cause of provocation[.]" *Id. See also Commonwealth v. Cisneros*, 381 Pa. 447, 451, 113 A.2d 293, 296 (1955) (holding that "[t]he law of Pennsylvania is clear that no words of provocation, reproach, abuse or slight assault are sufficient to free the party from guilt of murder"); *Commonwealth v. Walters*, 431 Pa. 74, 244 A.2d 757 (1968) (holding that the decedent cursing at and arguing with the defendant prior to murder was insufficient evidence that heat of passion caused murder or that there was an insufficient cooling period); *Commonwealth v. Hutchinson*, 611 Pa. 280, 25 A.3d 277 (2011),

*cert. denied*, 132 S.Ct. 2711 (2012) (holding that the defendant was not sufficiently provoked into heat of passion by argument with victim occurring shortly before murder or by other serious issues in relationship); *Commonwealth v. Sanchez*, 623 Pa. 253, 315, 82 A.3d 943, 980 (2013), *cert. denied*, 135 S.Ct. 154 (2014) (concluding that the defendant was not seriously provoked when there was no gun in the decedent's possession and when the defendant "could have simply retreated" from the situation).

Second, defendant armed himself with a gun, walked to the victim's place of employment without invitation, and initiated the argument with decedent. The evidence presented by the Commonwealth shows that it was decedent who yelled for someone to call police when defendant confronted him with a gun while he was inside a vehicle. The Commonwealth also presented the testimony of forensic pathologist Dr. Collins, who stated that the nature of the wounds sustained by the decedent were consistent with the decedent suffering gunshots then turning his back in an attempt to move away from the bullets, only to suffer additional gunshot wounds. Thus, the evidence showed that decedent made an attempt to retreat from the driver's side of the vehicle after defendant started shooting at him. Accordingly, there was no error in determining that there was inadequate provocation to merit jury instructions on voluntary manslaughter. *See Commonwealth v. McCusker*, 448 Pa. 382, 292 A.2d 286 (1972) (ruling that "[t]he relevant inquiry is threefold: did the defendant actually act in the heat of passion when he committed the homicide; did the provocation directly lead to the slaying of the person responsible for the provocation; and was there insufficient 'cooling time' thus preventing a reasonable man from using his 'reasoning faculties' and 'capacity to reflect'").

The evidence clearly showed that defendant committed first-degree murder, instead of voluntary manslaughter, as he possessed malice and the specific intent to kill the decedent. *See*

*Commonwealth v. Butler*, 446 Pa. 374, 378, 288 A.2d 800, 802 (1972) (reiterating that "it has long been the law that the use of a deadly instrument on a vital part of the body is sufficient to establish the specific intent to kill"); *Commonwealth v. Davis*, 479 A.2d 1077, 1080 (Pa. Super. 1984) (ruling that "[a]ll that is required is a conscious, fully formed intent to bring about the death of another"). *See also Commonwealth v. Pirela*, 510 Pa. 43, 51, 507 A.2d 23, 27 (1986) (quoting *Berry*, 461 Pa. at 237, 336 A.2d at 264, which noted that voluntary manslaughter " 'is a concession to the infirmity of human nature, not an excuse for undue or abnormal irascibility' "). In light of these facts, the introduction of expert testimony would have only caused confusion amongst the jury. *See Commonwealth v. Rounds*, 518 Pa. 204, 209, 542 A.2d 997, 999 (1988) (noting that "[w]ithout the facts, a jury cannot make any determination as to validity of the expert's opinion"); *Commonwealth v. Funke*, 452 A.2d 857, 862 (Pa. Super. 1982) (quoting *Commonwealth v. Zeger*, 186 A.2d 922, 925 (Pa. Super. 1962), which informed that "[o]ne of the duties of a trial judge is 'to clarify the issues so that the jury may comprehend the questions they are to decide' "). Because there was no factual basis to reduce first-degree murder to voluntary manslaughter, this court did not err in excluding the expert testimony on this particular issue.

Defendant next contends that this court erred in refusing his requests to instruct the jury on voluntary manslaughter, diminished capacity, and voluntary intoxication or drugged condition. In reviewing a trial court's refusal to provide a jury instruction, the appellate court reviews whether the jury instruction is warranted by the evidence presented in the case. *Commonwealth v. Baker*, 963 A.2d 495 (Pa. Super. 2008). Indeed, a trial court has no obligation "to instruct a jury upon legal principles which have no applicability to the presented facts." *Commonwealth v. Bohonyi*, 900 A.2d 877, 883 (Pa. Super. 2006) (quoting *Commonwealth v. Buksa*, 655 A.2d 576, 583 (Pa. Super. 1995)). Furthermore, an appellate court "may reverse not

where the court fails to use the specific language requested by the accused, but rather only where the applicable law is not adequately, accurately, and clearly communicated to the jury." *Commonwealth v. Leber*, 802 A.2d 648, 651 (Pa. Super. 2002). The Superior Court has also explained that "[i]n examining the propriety of the instructions a trial court presents to a jury, [its] scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case." *Commonwealth v. Nyankun Thomas*, 904 A.2d 964, 970 (Pa. Super. 2006).

First, defendant contends that this court erred in denying his request to instruct the jury on voluntary manslaughter. As previously discussed, there was no evidentiary support for a voluntary manslaughter verdict. A defendant "is entitled to a jury instruction on voluntary manslaughter only 'where the offense has been made an issue in the case and where the evidence would reasonably support such a verdict.' " *Kim*, 888 A.2d at 852 (quoting *Frederick Thomas*, 552 Pa. at 640, 717 A.2d at 478). Because there was insufficient support for the conclusion that defendant committed voluntary manslaughter, this court was not required to provide an instruction regarding this offense because it was inapplicable. As the court held in *Commonwealth v. Phillips*, 946 A.2d 103 (Pa. Super. 2008), " '[i]nstructions regarding matters which are not before the court or which are not supported by the evidence serve no purpose other than to confuse the jury.' " *Id.* at 110 (quoting *Commonwealth v. Patton*, 936 A.2d 1170, 1176 (Pa. Super. 2007)). Consequently, there was no abuse of discretion or error of law in denying defendant's request. Accordingly, defendant's claim has no merit.

Defendant further asserts that this court erred in denying his request for a jury instruction on diminished capacity. In *Commonwealth v. Laird*, 555 Pa. 629, 645, 726 A.2d 346, 353 (1999), the court explained that a diminished capacity defense "is only available to a defendant

who admits criminal liability but contests the degree of guilt." A successful diminished capacity defense "negates the element of specific intent and, thus, mitigates first-degree murder to third-degree murder." *Commonwealth v. Rosen*, 615 Pa. 305, 308, 42 A.3d 988, 990 n.1 (2012). Our Supreme Court has further noted that "[d]iminished capacity is an extremely limited defense, which requires extensive psychiatric testimony establishing a defendant suffered from one or more mental disorders which prevented him from formulating the specific intent to kill." *Commonwealth v. Cuevas*, 574 Pa. 409, 418, 832 A.2d 388, 393 (2003).

A jury instruction on diminished capacity was not required in this case because there was no factual predicate for this defense. In *Commonwealth v. Weiskerger*, 520 Pa. 305, 312-313, 554 A.2d 10, 14 (1989), the court held that "[a] defendant is entitled to an instruction on any recognized defense which has been requested, which has been made an issue in the case, and for which there exists evidence sufficient for a reasonable jury to find in his or her favor." In his attempt to present a diminished capacity defense, defendant introduced the testimony of Dr. Alan Tepper who testified as a psychological expert. Prior to trial, Dr. Tepper conducted a psychological evaluation of defendant and prepared a report. At trial, Dr. Tepper discussed several contributors to defendant's mental and emotional state at the time of the killing. Those factors included defendant possessing a modest intelligence quotient score, abusing opiates and benzodiazepines prior to the murder, having underlying emotional and mental health issues, having an intense grief reaction to his mother's recent death, and having a contentious history with the decedent. According to Dr. Tepper, defendant would experience a diminution in his thinking, decision-making, and problem-solving abilities when he was intoxicated or emotionally distraught. In spite of this observation, Dr. Tepper stated that he could not provide a conclusion

on the "factual question" of whether or not a mental disorder or defect directly affected defendant's ability to formulate the specific intent to kill.[2]

Certainly, whether or not a defendant possesses the specific intent to kill is a factual question for the jury. Nevertheless, an expert may testify on "issues that ultimately must be decided by the trier of fact, in this case, the jury." *Commonwealth v. Huggins*, 68 A.3d 962, 967 (Pa. Super. 2013). *See also* Pa. R. Evid. 704 (stating that "[a]n opinion is not objectionable just because it embraces an ultimate issue"). Specifically, psychiatric expert testimony is admissible " 'on the issue of specific intent to kill if it speaks to mental disorders affecting the cognitive functions necessary to formulate a specific intent.' " *Commonwealth v. Ventura*, 975 A.2d 1128, 1141 (Pa. Super. 2009) (quoting *Commonwealth v. Kuzmanko*, 709 A.2d 392, 398 (Pa. Super. 1998)).

The requisite expert testimony was not provided in this case. Indeed, experts are not required to use " 'magic words' when expressing their opinions." *Commonwealth v. Baez*, 554 Pa. 66, 101, 720 A.2d 711, 728 (1998), *cert. denied*, 528 U.S. 827 (1999). Rather, it is the substance of the expert's testimony that the court considers when determining whether the

---

[2] The following exchange occurred between defense counsel and the expert:

> [Defense Counsel]:    Okay. But correct me if I'm wrong her, but it's also, you can't give a final opinion right now to this jury whether he did or did not actually form that intent that day, right?
>
> [Expert]:    No, not that factual question, no, sir.

N.T. 01/08/15, pp. 235-236. The following exchange occurred between the assistant district attorney and the expert:

> [Assistant District Attorney]:    Did I hear you right, it's your opinion today to a reasonable degree of scientific and psychological certainty that you don't know one way or the other as of May ninth, 2012, whether or not David Reyes could form the specific intent to kill? Is that what you're saying?
>
> [Expert]:    Correct.
>
> [Assistant District Attorney]:    So you don't have an opinion as it relates to that day.
>
> [Expert]:    Not to that fact.

N.T. 01/08/15, p. 239.

*Commw. v. David Reyes*           Page 21 of 25

requisite standard has been met. *See id.* Although Dr. Tepper observed that defendant's mental and emotional state was influenced by several factors including anxiety and depression, the fact that defendant was diagnosed with a mental disorder or defect was not dispositive. In *Hutchinson*, 611 Pa. at 312, 25 A.3d 277, the court ruled that a "diagnosis with a personality disorder does not suffice to establish diminished capacity." *See also Ventura, supra* (deeming expert testimony of defendant's substance abuse, adjustment disorder, antisocial personality features, and depressive features irrelevant to diminished capacity defense). There was no expert testimony on the ultimate issue of whether or not defendant had a mental disorder or defect that directly affected his ability to formulate the specific intent to kill. This case is akin to *Commonwealth v. McCullum*, 558 Pa. 590, 596, 738 A.2d 1007, 1010 (1999), where our Supreme Court held that a diminished capacity defense was not established because the expert "made no mention of [the defendant's] cognitive functions of deliberation and premeditation at the time of the murder or of his ability – or inability – to formulate the specific intent to kill." Similarly, as aforementioned, the psychological expert in this case did not provide an opinion on this salient issue.

In addition to presenting Dr. Tepper, defendant also presented the testimony of his sister Yvette Reyes. Defendant also testified to support his claim. At trial, defendant's sister Yvette described defendant as being "out of it" when she saw him on the day before the murder. She stated that defendant was slurring and was not making any sense. Defendant testified that he had taken too many Percocet and Xanax pills on the day before the murder and that he was experiencing the aftereffects on the day that he committed this killing. Defendant also stated that he felt a mixture of emotions that he did not know how to handle. He admitted to feeling angry, sad, and confused, and to not feeling like himself. Defendant further claimed that he "blanked

out" and lost control when the decedent made offensive remarks about his mother. The testimony presented by defendant did not show that defendant was subjected to a mental disorder or defect that prevented him from forming the specific intent to kill. Instead, such testimony only led the jury to infer that defendant acted impulsively and without control when he killed the decedent. It did not support a diminished capacity defense. In *Commonwealth v. Terry*, 501 Pa. 626, 632, 462 A.2d 676, 679 (1983), the court held that "simple lack of control is not available in Pennsylvania either to negate mens rea or to establish diminished capacity in a murder prosecution." *See also Kuzmanko* (concluding that the defense theory that the defendant lost control and acted in a fit of rage did not support diminished capacity defense); *Commonwealth v. Brown*, 578 A.2d 461, 466 (Pa. Super. 1990) (holding that "a detailed description of appellant's past bizarre behavior is not relevant to appellant's alleged diminished capacity at the time of the criminal act"). In *Commonwealth v. Washington*, 547 Pa. 563, 571-572, 692 A.2d 1024, 1028 (1997), *cert. denied*, 523 U.S. 1006 (1998), the court reiterated the principle that "jury instructions regarding particular crimes or defenses are not warranted where the facts of the case do not support those instructions." Accordingly, this court did not err in refusing defendant's requested diminished capacity instruction because the facts did not warrant the provision of such instruction.

Defendant also claims that this court erred in denying his request for a jury instruction on voluntary intoxication or drugged condition. Pursuant to Section 308 of the Crimes Code, 18 Pa. C.S. §308, evidence of voluntary "intoxication or drugged condition of the defendant may be offered by the defendant whenever it is relevant to reduce murder from a higher degree to a lower degree of murder." Certainly, "an actor should not be insulated from criminal liability for acts which result from a mental state that is voluntarily self-induced." *Commonwealth v. Hicks*,

483 Pa. 305, 311, 396 A.2d 1183, 1186 (1979). Nevertheless, the defense of voluntary intoxication "can negate the intent necessary for a conviction of first-degree murder and reduce the crime of murder from first to third degree." *Commonwealth v. Fletcher*, 580 Pa. 403, 419, 861 A.2d 898, 907-908 (2004), *cert. denied*, 547 U.S. 1041 (2006). To be entitled to a jury instruction on voluntary intoxication, "there must be some evidence that the defendant is overwhelmed or overpowered by alcohol or drugs to the point of losing his faculties or sensibilities." *Commonwealth v. Galvin*, 603 Pa. 625, 651, 985 A.2d 783, 798 (2009), *cert. denied*, 559 U.S. 1051 (2010).

Defendant was not entitled to this jury instruction because the evidence did not warrant the jury's consideration of this defense. At trial, defendant testified that he had ingested several Percocet and Xanax pills the day before the murder and had experienced the aftereffects of those drugs when this killing occurred. He did not testify to ingesting drugs on the day of the murder, and he never claimed to be in an intoxicated or drugged state on that day. Neither did he establish that the ingestion of those drugs overwhelmed or overpowered him to the point where he lost his faculties or sensibilities at the time of the killing. Although expert testimony was not required to prove his defense, defendant presented the expert testimony of Dr. Tepper who stated that he could not provide a definitive opinion on whether or not the drugs that defendant previously ingested had any significant effect on him on the day of the murder. *See* N.T. 01/08/15, p. 240; *Commonwealth v. Laurenson*, 470 A.2d 122, 127 (Pa. Super. 1983) (holding that "[e]xpert testimony is not necessary to prove intoxication").

As the court held in *Commonwealth v. Padilla*, 622 Pa. 449, 493, 80 A.3d 1238, 1263 (2013), *cert. denied*, 134 S.Ct. 2725 (2014), "[e]vidence that the accused ingested alcohol or other intoxicating drug – without more – does not warrant a voluntary intoxication instruction."

Without defendant showing more than experiencing a hangover from drugs that he took the day prior, he failed to present sufficient evidence to warrant a jury instruction on this defense. In *Arrington*, the court reiterated that " 'a trial court should not instruct a jury on legal principles which bear no relationship to the evidence presented at trial.' " *Id.*, 624 Pa. at 538, 86 A.3d at 850 (quoting *Commonwealth v. Solano*, 588 Pa. 716, 733, 906 A.2d 1180, 1190 (2006)). Because the facts insufficiently supported a voluntary intoxication or drugged condition defense, this court did not err in denying defendant's request for this particular instruction.

Even if error is found by this court's refusal to provide the above requested jury instructions, "a new trial is warranted only where such error has been clearly prejudicial to the appellant." *Commonwealth v. Serge*, 837 A.2d 1255, 1265 (Pa. Super. 2003). As a whole, this court adequately, accurately, and clearly communicated applicable law to the presented evidence and sufficiently guided the jury on how to conduct its deliberations. *See Commonwealth v. Williams*, 581 Pa. 57, 80, 863 A.2d 505, 519 (2004) (holding that "[j]ury instructions will be upheld if they adequately and accurately reflect the law and are sufficient to guide the jury properly in its deliberations"). Accordingly, defendant was not prejudiced by this court's rulings at trial.

Therefore, in light of the foregoing, the judgment of sentence should be AFFIRMED.

BY THE COURT,

Sandy L.V. Byrd,    J.