**[J-31-2025] [MO: Wecht, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 813 CAP |
| | : | |
| Appellee | : | Appeal from the Order entered on |
| | : | December 29, 2023, in the Court of |
| | : | Common Pleas of Bucks County, |
| v. | : | Criminal Division, at No. CP-09-CR- |
| | : | 0001413-2014 |
| | : | |
| MARCEL EMANUEL JOHNSON, | : | SUBMITTED:  February 26, 2025 |
| | : | |
| Appellant | : | |

**DISSENTING OPINION**

**JUSTICE DONOHUE**                                   **DECIDED: March 26, 2026**

Marcel Emanuel Johnson's sentence of death was based on, inter alia, the jury's

finding that "[t]he victim was a prosecution witness to a murder or other felony committed

by the defendant and was killed for the purpose of preventing his testimony against the

defendant in any grand jury or criminal proceeding involving such offenses."[1]  42 Pa.C.S.

§ 9711(d)(5) ("Section 9711(d)(5)").  The Majority's scrupulous review of the evidence

introduced during the guilt phase of Johnson's trial brings to light the only evidence on

which the aggravating circumstance was based: the testimony of a jailhouse informant

---

[1] A death sentence requires a jury's unanimous determination that the Commonwealth proved beyond a reasonable doubt the existence of certain aggravating circumstances that outweighed any mitigating factors proven by the defense by a preponderance of the evidence.  42 Pa.C.S. § 9711(c).  Here, the jury found three aggravating circumstances and three mitigating circumstances and found that the aggravating circumstances outweighed the mitigating circumstances to reach its sentence.  42 Pa.C.S. §§ 9711(d)(5), (11) (conviction of another murder at the same time), and (16) (that the victim was less than twelve-years-old);  42 Pa.C.S. §§ 9711(e)(1) (that defendant has no significant criminal history), (e)(4) (the age of the defendant at the time of the crime), and (e)(8) (catchall).  *Commonwealth v. Johnson*, 160 A.3d 127, 135-36 (Pa. 2017).

from Bucks County Correctional Facility ("BCCF"), George Lewis. Its review also shows that impeachment of Lewis's testimony—whether by fault of the Commonwealth or trial counsel's ineffectiveness—was plainly deficient. The Majority establishes that the problems with Lewis's testimony did not infect the deliberation of guilt because there was adequate circumstantial evidence **other than Lewis's testimony** to support Johnson's convictions, and I fully agree. I depart from the Majority, however, because I believe that the deficiency in the impeachment of Lewis infected the jury's deliberation of Section 9711(d)(5) and contributed to Johnson's death sentence. I also write to express my concern with the application of a due diligence requirement to claims raising violations of the constitutional rule announced in *Brady v. Maryland*, 373 U.S. 83 (1963). I would vacate Johnson's sentence and remand for a new penalty phase.

**Lewis's Guilt Phase Testimony**

During the guilt phase of Johnson's trial, George Lewis testified. On direct examination, Assistant District Attorney (ADA) Weintraub reviewed Lewis's prior history including convictions for burglary, theft, hindering apprehension and crimes of dishonesty; pending charges for shoplifting, burglary; and pending parole violation for fleeing and eluding. N.T., 6/1/2015, at 221-22. Lewis testified that he believed the prosecution would, after he testified, "help [him] with [his] parole violation," although he had not been made any promises about his sentence. *Id*. at 222. He stated that ADA Weintraub had helped him out with a detainer, but not other outstanding prison "misconducts." *Id*.

Speaking to the facts of this case, Lewis testified that while he was in BCCF, he was hired to be a "babysitter," a job that entailed watching over an inmate that may hurt himself or others or someone with institutional charges. *Id*. at 224-25. Lewis was assigned to babysit Johnson the week of Thanksgiving 2013. *Id*. at 227. According to Lewis's account, he was sitting by the door of Johnson's cell when he saw Johnson sitting

on the end of his bed with his head down. Lewis asked him "What's wrong?" and Johnson responded that "She made me – she made me kill her." *Id*. at 230. Lewis asked who, and Johnson answered "Ebony." *Id*. Testifying to the jury regarding this interaction, Lewis said, "I don't know this woman. I don't know her, I don't know him. I don't know anyone. Like I said, I'm from New Jersey." *Id*. According to his account, Johnson continued talking and confessed, "And also, I killed the baby." *Id*. Lewis asked, "You killed a baby?" and Johnson responded, "Yeah. I had to stab her because she very – she 4 years old. She very smart and she can identify me." *Id*.[2] Lewis testified that he extended two kindnesses to Johnson during their interactions by giving him a jolly rancher and helping him to try to place a phone call.

During his testimony, Lewis admitted that he had "heard about [the case], but … never knew that was the defendant that I was watching." *Id*. He said he knew about it from watching the news and people talking about it in jail. He also said that his understanding was that Johnson was incarcerated for drug paraphernalia, not murder. *Id*. at 231. Lewis testified that he was "very surprised" by Johnson's revelations, particularly because Lewis himself could never hurt anybody, especially because he had a four-year-old granddaughter. *Id*. at 232. Asked why he came forward, Lewis stated it was because people were hurt in this situation including a baby, unborn child and young mother. *Id*. He admitted that he was hoping to help himself, too. *Id*.

On cross-examination, Lewis explained that his prison "misconducts" were for fight charges and for not being on the medical unit at one point. *Id*. at 241-42. He explained that he spent time in restrictive housing, the location where he had been babysitting

---

[2] ADA Weintraub asked Lewis to recount this multiple times. Lewis testified: "He said he stabbed the baby in the upper chest, I think he told me." N.T., 6/1/2015, at 233; *id*. at 239 (stating that Johnson told him he stabbed her once in the upper chest). Then, asked what else Johnson told him about the four-year-old, Lewis stated that "She was very smart and that she could identify him." *Id*. at 234.

Johnson, as a result of the "misconducts." *Id*. Trial counsel cross-examined Lewis about a few topics. He challenged whether Lewis had conditioned his assistance on receiving help with the "misconducts," which Lewis denied. *Id*.[3] Next, counsel questioned Lewis persistently about the exact date he received the information from Johnson and Lewis's inconsistencies in his representation about whether the conversation with Johnson took place on a Monday, Tuesday or Wednesday. *Id*. at 243-49. Counsel generally inquired about Lewis's knowledge of the case from the news and from talking with other people in prison. *Id*. at 249-51. Regarding the jolly rancher candy, counsel questioned Lewis about whether he had the candy in his pocket because of his diabetes. *Id*. at 251. Counsel questioned Lewis about whether allowing Johnson to place a phone call was not typically allowed for individuals on watch. *Id*. at 251-53. Finally, counsel questioned Lewis about what Johnson was wearing during their interactions—an orange jumper. *Id*. at 253-54.

**Penalty phase**

Lewis's testimony was incorporated into the penalty phase for the jury's consideration at sentencing. His testimony in relation to R.R.'s killing that Johnson told him that he killed the baby because she was "very smart and she can identify me" was critical to proving the aggravator, Section 9711(d)(5). N.T., 6/1/2015, at 230-31.

Pursuant to Section 9711(d)(5), the prosecution must prove that "[t]he victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses." 42 Pa.C.S. § 9711(d)(5). The prosecution must meet its burden of proving Section 9711(d)(5) either by establishing that a victim "was in fact a witness in a pending grand jury or criminal prosecution" or "where

---

[3] After the Commonwealth rested, trial counsel called an investigator from BCCF who testified that Lewis brought him this information regarding Johnson and when he did so, he sought for his misconducts to be reduced. N.T., 6/2/2015, at 18-23.

the killing results from the intention to eliminate a potential witness, if such facts can be established by **direct** evidence." *Commonwealth v. Appel*, 539 A.2d 780, 784 n.2 (Pa. 1988) (emphasis in original). Since *Appel*, this Court has consistently reaffirmed the latter requirement. Where the Commonwealth intends to prove that the killing intended to eliminate a potential witness, it must do so through direct evidence. *See, e.g.*, *Commonwealth v. Daniels*, 104 A.3d 267, 313 (Pa. 2014); *Commonwealth v. Eichinger*, 915 A.2d 1122, 1144-45 (Pa. 2007); *Commonwealth v. Fletcher*, 861 A.2d 898, 910-11 (Pa. 2004).

Consistent with that requirement, the trial court instructed the jury that under this aggravating circumstance, "the killer's intention to eliminate the victim as a potential witness" must be "established through direct evidence" and proved beyond a reasonable doubt. N.T., 6/8/2015, at 198-99. The trial court highlighted that Lewis's testimony was the **only** direct evidence to prove this aggravating circumstance regarding Johnson's confession:

> Now, here there is only one piece of direct evidence that was presented in this trial, and that is the testimony of George Lewis. That evidence regarding the defendant's statement, allegedly made at the Bucks County Correctional Facility as to why he killed [R.R].
>
> If you believe the testimony of George Lewis, and if you believe that the defendant made the statement that he killed the child because she saw him, could recognize him and was smart and that is why he killed her - - it is for you to recall the exact statement that was made. If you find - - if you believe that testimony and you believe that it is proven beyond a reasonable doubt, then that would be direct evidence of - - of - - direct evidence sufficient for you to find that the child was, in fact, killed in order to prevent her from testifying in a criminal proceeding.

*Id*. Thus, the aggravating circumstance was entirely dependent on the jury's evaluation of Lewis's testimony and credibility.

**The impeachment evidence not presented**

During the PCRA proceedings, Johnson identified significant information that trial counsel should have uncovered or should have realized was in his possession to impeach Lewis at trial. Trial counsel's impeachment of Lewis should have included evidence that Lewis repeatedly offered to work as an informant for the District Attorney's Office ("DAO"), including by sending a letter to the DAO seeking benefits in exchange for cooperation. Johnson's Exhibit 240 (Letter, May 9, 2013, from Lewis to ADA David Heckler). He had been arrested for fleeing and alluding, receiving stolen property, recklessly endangering another person, unauthorized use of a motor vehicle and resisting arrest in 2013 because he engaged in a highspeed chase with police officers while driving a stolen vehicle.[4] Johnson's Exhibit 239 (Preliminary Hearing Memorandum from Courtnee Neumann, 2/12/2013). According to the preliminary hearing memorandum prepared by the Commonwealth, Lewis advised the affiant "that he wanted to cooperate … re being a CI." *Id*. In Lewis's subsequent handwritten plea to the DAO, he stated that he had worked as an informant for five years, "I can help you if you can help me," and "I have lot[]s of things that I know about [and] we can help each[]other." Johnson's Exhibit 240 (Letter, May 9, 2013, from Lewis to ADA David Heckler).

---

[4] The PCRA court, Commonwealth and Majority acknowledge that this evidence was not disclosed to trial counsel. PCRA Court Opinion, 4/5/2024, at 33 (recounting that the Commonwealth admits that it inadvertently did not disclose this letter). However, the PCRA court found that the letter would have been cumulative because the jury was aware of numerous attempts Lewis had made to cooperate in exchange for consideration on his outstanding cases. I have identified no support for the PCRA court's finding because in Lewis's testimony and in the testimony of the BCCF investigator, there is no reference to efforts to cooperate other than against Johnson. In fact, trial counsel admitted that he did not impeach Lewis with prior cooperation and that he ceased his questioning quickly because he believed Lewis was withstanding cross-examination too well. *See* N.T., 6/29/2023 (a.m.), at 113 (trial counsel testifying that at trial he did not impeach Lewis with his prior cooperation in New Jersey); 114 ("When the questioning isn't going the way you want it to go, sometimes the best thing to do is shut up and sit down.").

Lewis's corrections records would have assisted in impeachment as well.[5]  For instance, while in prison at BCCF, in 2013, Lewis alleged that Shaquel Rock, another inmate with whom he served, had confessed to Lewis that he killed an off-duty corrections officer.  *See* Johnson's Exhibit 243 (BCCF Incident Report of Chief Investigator Frank Bochenek, 10/13/2013).  Initially, the killing and the fact that Rock was a person of interest was reported in the news.  However, as the New Jersey investigation developed, two other persons were charged, not Rock.  *Id*.  Moreover, the BCCF Incident Report states that Lewis told the investigator "that all he wants is to have the two detainers from New Jersey dropped as they are for non-payment[,]" and that the investigator told him "that no deal can be made by this investigator and that [he] would contact the proper jurisdiction and relate the information to them."  *Id*.

A review of Lewis's corrections records would also show that he misrepresented his granddaughter's funeral to try to get a furlough.  Johnson's Exhibit 262 (Case Note from BCCF records, 5/31/2013 (indicating that multiple officers called the funeral home "only to be informed that no funerals were scheduled for June 1, 2013")).  A closer inspection of evidence in trial counsel's possession (i.e., Lewis's jail calls) would have contradicted Lewis's testimony that he did not "know this woman" or "anyone" involved because, as he told his wife of the phone, he was in prison with his cousin who he believed was R.R.'s father.  *Compare* N.T., 6/1/2015, at, 230 *with* Johnson's Exhibit 185

---

[5]  In addressing this claim, one could fault the Commonwealth for failing to turn over Lewis's corrections records and/or one could fault trial counsel for failing to request to review Lewis's corrections records.  Whether based on counsel's ineffectiveness or the prosecutor's failure to turn over the evidence, Johnson's penalty phase was unfair.  With regard to the alleged *Brady* violation, I question the Majority's premise that the Commonwealth did not have a duty to uncover Lewis's corrections records as well as the imposition of a requirement of due diligence on trial counsel to establish a *Brady* violation, as I address in the following section.  Nonetheless, I emphasize that the application of due diligence is of no consequence to my resolution of this issue because either way, Johnson is entitled to a new penalty phase.

(Transcript – Lewis Call 1, 11/30/2013, at 4 (stating that "the four-year-old girl, that's my cousin's baby dead. He in here."")).[6]

With this evidence, trial counsel could have attempted to show that Lewis was willing to do anything—including lying about another inmate's confession or his granddaughter's funeral—to get out of jail. As trial counsel testified at the PCRA hearing, the evidence regarding Rock and the letter to the DAO's office would have shown exactly what counsel wished to demonstrate through cross-examination of Lewis, "that he's testimony for hire." N.T., 6/28/2023, at 194; *id*. at 195 (referring to the letter to the DAO's office as "an express example of something I was trying to prove"). The clear implication trial counsel could have drawn was that Lewis's claim was incredible as to Rock just as it was as to Johnson.

In addition to the significant impeachment regarding Lewis's "testimony for hire," Johnson advances substantial arguments that counsel also should have uncovered—and Lewis should have been cross-examined about—Lewis's outstanding charges, the significant sentences to which he was exposed, and any benefits he hoped to obtain through his cooperation. Johnson's Brief at 56-57 (arguing that trial counsel should have cross-examined Lewis about the fact that he was facing years in prison and therefore had a motive to testify falsely). Myriad evidence establishes that Lewis had a lot to gain from testifying, significant criminal exposure, and a history of attempting to lie (or "cooperate") his way out of jail. Virtually none of this evidence was before the jury at trial, and the jury was therefore unable to engage in an informed deliberation of Lewis's credibility.

---

[6] Johnson has shown that Lewis's cousin Kevin Fant was incarcerated with Lewis, and that Fant dated Talley from 2008 to 2011 and attended R.R.'s birth and for a time believed he was R.R.'s father. *See* Johnson's Brief at 52-55.

## I.    Ineffective assistance of counsel

To establish ineffective assistance of counsel, a PCRA petitioner must plead and prove that the claim has arguable merit, that counsel had no reasonable basis for the challenged act or omission, and that the ineffectiveness caused him prejudice. *Commonwealth v. Pierce*, 527 A.2d 973, 974-75 (Pa. 1987). Prejudice occurs where there is a reasonable likelihood that, but for counsel's ineffectiveness, the result of the proceeding would have been different. *Id*. This Court has recognized claims of ineffectiveness based on counsel's failure to impeach a witness on certain issues, as has the Superior Court.[7] This is unsurprising given the vital importance of cross-examination to the adversarial and truth-seeking processes of criminal trials. *Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.").

Here, Johnson has established that trial counsel should have conducted an investigation into Lewis's background and utilized impeachment of Lewis to expose his significant bias and motive for testifying. Counsel admitted that he failed to request, inter alia, Lewis's correction records, and did little to no investigation. N.T., 6/28/2023, at 207. Trial counsel also admitted that he could have used the evidence detailed above to

---

[7] *Commonwealth v. Cousar*, 154 A.3d 287, 295-302, 307 (Pa. 2017) (remanding for an evidentiary hearing to address whether defense counsel was ineffective for failing to cross-examine a police officer about discrepancies in his report and to address the adequacy of counsel's impeachment of an eyewitness); *Commonwealth v. Bolden*, 517 A.2d 935, 940-42 (Pa. 1986) (Opinion Announcing the Judgment of the Court) (remanding for an evidentiary hearing to address whether counsel had a reasonable basis for failing to impeach a police officer about an inconsistency between his testimony and police report); *Commonwealth v. Strutt*, 624 A.2d 162, 163-66 (Pa. Super. 1993) (finding counsel was ineffective for failing to prepare for cross-examination and cross-examine a Commonwealth witness about the victim's conduct following the sexual assault at issue, which testimony demonstrated the victim was acting normally and thus supported the defense that there was no assault).

expose Lewis's testimony as "testimony for hire." *Id*. at 194. Thus, this claim is of arguable merit.

Trial Counsel had no reasonable basis for failing to uncover and exploit these weaknesses in Lewis's testimony. Counsel's strategy was to show that Lewis was lying. Again, using counsel's own words, there was express evidence supporting the defense theory and counsel believed that this "information would have been important" to aid in impeaching Lewis. *Id*. at 176. The PCRA court's explanation for trial counsel's approach is unconvincing. Speaking only to evidence that trial counsel possessed but decided not to use to impeach Lewis, the PCRA court credited counsel's decision to forego questioning Lewis because he was "answering questions so well," and counsel wished to preserve his own credibility. PCRA Court Opinion, 5/14/2024, at 23. Given the strength of the impeachment evidence uncovered, trial counsel's initial evaluation of Lewis's testimony might not have held up. Even if trial counsel decided to forgo questioning Lewis, he could have questioned the prison investigator or another Commonwealth witness about Lewis's history of providing testimony (even false testimony) to benefit himself. To the extent trial counsel failed to engage in an investigation of Lewis and uncover this impeachment, this failure was not supported by any reasonable strategy.

As to prejudice, I would separately analyze the guilt phase and penalty phase. As to the guilt phase, I note that the Majority correctly finds that the non-disclosure of the *Brady* evidence was not material because a trial totally devoid of the evidence (i.e., had Lewis not testified) would have led to the same result with regard to the guilt verdict and that cross-examination on the point would have also led to the same result. On this conclusion I am aligned with the Majority. As the Majority explains, the jury was "informed that Lewis had offered information and testimony for personal benefit in this case." Majority Op. at 44; N.T., 6/1/2013, at 221-32. The testimony at trial established Lewis's

willingness to cooperate against Johnson, that he had already benefited from coming forward with the information against Johnson, and that Lewis faced charges. Trial counsel even called an investigator from the BCCF who indicated that Lewis brought forward the information regarding Johnson and in exchange, asked for his institutional misconducts to be reduced. N.T., 6/2/2015, at 18-23. However, there was no reference to any other instance in which Lewis cooperated with law enforcement in his own self-interest. I agree with the Majority's conclusion that this evidence, though problematic, was not material to the determination of Johnson's guilt. Majority Op. at 40-41, 54-55.

Nonetheless, Johnson presents compelling arguments that he suffered prejudice as to penalty phase. Johnson's Brief at 32-34. As explained above, the Commonwealth relied on Lewis's testimony alone as the direct evidence to support the aggravator in Section 9711(d)(5). Indeed, because the Commonwealth intended to prove that the killing intended to eliminate a potential witness, it was required to do so through direct evidence, and Lewis was its only source of Johnson's confession. *See, e.g.*, *Daniels*, 104 A.3d at 313; *Eichinger*, 915 A.2d at 1144-45; *Fletcher*, 861 A.2d at 910-11; N.T., 6/8/2015, at 198-99 (instructing jury that the only direct evidence to establish this aggravator was the testimony of Lewis). Had the jury been presented with this powerful impeachment evidence suggesting that Lewis was an informant for hire and a liar, there is a reasonable possibility that one or more of the jurors would have found that Lewis's testimony was not credible and therefore, that the Commonwealth did not establish the aggravating circumstance beyond a reasonable doubt, and further that the two remaining aggravating circumstances did not outweigh the three mitigating circumstances.[8] Because I believe

_____

[8] Engaging in this prejudice analysis requires us to "evaluate the relative strength of the evidence in aggravation and mitigation, as well as the parties' arguments in light of the full hybrid record produced at trial and upon collateral attack." *Commonwealth v. Daniels*, 104 A.3d 267, 304 (Pa. 2014). In my view, once we acknowledge the reasonable likelihood that jurors would have rejected this aggravator in this case, the balance has
(continued…)

Johnson has established that counsel provided ineffective assistance in failing to adequately investigate and impeach Lewis, I would vacate Johnson's sentence and remand for a new penalty phase trial.

## II.    *Brady* and due diligence

In *Brady*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  There are "three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have

---

changed so significantly that a remand for a new penalty phase is warranted.  *Id*. at 284 (Saylor, J., concurring) (stating that the standard pertaining to prejudice places appellate courts in a difficult position of speculating "whether each one (and every one) of twelve individuals, having twelve unique mindsets which we cannot know, would have supported a death sentence, had an appropriate defense presentation been made. … I believe we should err on the side of providing defendants with one trial at which the defense is guided by a competent, prepared lawyer") (quoting *Commonwealth v. Koehler*, 36 A.3d 121, 162 (Pa. 2012) (Saylor, J., concurring)).

Instead of engaging in the deliberative weighing process described by the *Daniels* Court, the Majority cursorily decides that, in light of the two other aggravators found by the jury—that the victim was under twelve years old and that the defendant was convicted of another murder at the same time—it cannot deem it reasonably probable that one or more jurors would have retreated from a sentence of death.  Majority Op. at 77-78.  This analysis does not follow the "very specific guidelines about how [it] should weigh the various mitigating and aggravating circumstances."  N.T., 6/8/2015, at 205 (instructing jury).  The Majority does not acknowledge the mitigating circumstances let alone address the relative strength of the evidence in mitigation, nor does it address the fact that the same jury returned a life sentence with respect to the mother's killing.  In sum, the Majority is acting as a super jury without engaging in the individualized weighing of the remaining aggravating circumstances and the mitigating circumstances—a weighing process that is constitutionally and statutorily mandated in capital sentencing.  *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978); 42 Pa.C.S. § 9711.

ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). According to the High Court, the *Brady* obligation applies to

> any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, *see Brady*, 373 U.S., at 87, 83 S.Ct., at 1196–97), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995).

Thus, the basic duty of the prosecutor established in *Kyles* is that the prosecutor must learn of and disclose any favorable evidence known to others acting on the government's behalf in a case. *See, e.g.*, *Commonwealth v. Bagnall,* 235 A.3d 1075 (Pa. 2020) ("[K]nowledge of favorable evidence known to others acting on the government's behalf in a case will be imputed on the governmental body conducting the prosecution.") In *Bagnall*, for instance, this Court held that the duty extended to the cooperation agreement between the Mercer County District Attorney's Office and a witness, although the Office of the Attorney General later assumed the prosecution and was never made aware of the existence of the agreement.

As Johnson cites, the Ninth Circuit Court of Appeals has interpreted the *Brady* obligation to require that "[w]hen the state decides to rely on the testimony of such a witness [as a jailhouse informant], it is the state's obligation to turn over all information bearing on that witness's credibility[,]" including "the witness's criminal record, including prison records, and any information therein which bears on credibility." *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997). The *Carriger* court found that the state had an obligation, before putting the jailhouse informant on the stand, to obtain and review the jailhouse informant's corrections file, "and to treat its contents in accordance with the

requirements of *Brady* and *Giglio*." *Id.* I believe that the Ninth Circuit in *Carriger* correctly determined that the state's disclosure obligations under *Brady* extend to the corrections file of its key witness. Thus, in my view, the prosecution's *Brady* obligation applied to Lewis's corrections documents.

Although my disagreement with the Majority is specifically about corrections records, I believe it stems from a more foundational disagreement about our *Brady* jurisprudence. Namely, the Majority recounts the *Brady* standard and tacks on that "*Brady* is not violated when the appellant knew **or, with reasonable diligence**, could have uncovered the evidence in question, or when the evidence was available to the defense from other sources." Majority Op. at 23 (quoting *Commonwealth v. Roney*, 79 A.3d 595, 608 (Pa. 2018) (emphasis added)). In describing the PCRA court's opinion, the Majority includes the same notion that *Brady* includes this fourth requirement, i.e., that the evidence must not have been available to the defense with reasonable diligence, or else the *Brady* claim will be defeated. Majority Op. at 37 (stating that where the asserted *Brady* violation arises out of records equally available to the defense, "no *Brady* violation occurs"). I am concerned with the suggestion that there exists a rule requiring a defendant to act with reasonable diligence to establish a *Brady* claim.

Many Pennsylvania cases repeat the proposition that *Brady* is not violated if the appellant could have uncovered the same evidence with due diligence. *See, e.g.*, *Commonwealth v. Carson*, 913 A.2d 220, 245 (Pa. 2006); *Commonwealth v. Bagnall*, 235 A.3d 1075, 1091 (Pa. 2020). The Court originally pulled from federal case law in *Commonwealth v. Paddy*, 800 A.2d 294, 305-06 (Pa. 2002), when we stated that

> no *Brady* violation occurs … **if the defendant knew, or with reasonable diligence could have known, of such evidence**, *see United States v. Starusko,* 729 F.2d 256, 262 (3d Cir. 1984) [overruled by *Dennis v. Secretary, Pennsylvania Department of Corrections*, 834 F.3d 263 (3d

Cir. 2016)]; *United States v. Campagnuolo,* 592 F.2d 852, 861 (5th Cir.1979).[4] …

[4]  *But cf. Banks v. Reynolds*, 54 F.3d 1508 (10th Cir. 1995) (reasoning that, given the workload of the public defender's office, defense counsel could reasonably have forgotten that he had previously represented another person who had initially been charged with the defendant's crime, and the state was obligated to disclose information concerning that person to the defense).

*Id*. (emphasis added).   There continues to be a Circuit split about whether requiring a showing of due diligence on the part of the defense is inconsistent with *Brady*.[9]  And since *Paddy*, the Third Circuit has withdrawn from its reasoning in *Starusko* that "the government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself." *Starusko*, 729 F.2d at 262 (quoting *Campagnuolo*, 592 F.2d at 861), *overruled by Dennis*, 834 F.3d 263.

The Third Circuit expressly overruled its line of cases applying a diligence requirement, reasoning that the United States Supreme Court never recognized a due diligence duty of defense counsel as part of *Brady*.  *Dennis*, 834 F.3d at 290.  It highlighted that *Brady* and the cases applying it are entirely focused on disclosure by the prosecution, not diligence by the defense.  *Id*.  Assessing whether defense counsel could have uncovered the evidence was, according to the Third Circuit, "beside the point," and requiring such an assessment would be like "add[ing] a fourth prong" to the *Brady* analysis.  *Id*. at 291, 293.  We are not bound by *Dennis*,[10] but it should give us pause given that we drew this fourth prong from the federal courts of appeals in the first place.

---

[9]  See Kate Weisburd, *Prosecutors Hide, Defendants Seek: The Erosion of Brady Through the Defendant Due Diligence Rule*, 60 U.C.L.A. L.REV. 138 (2012).

[10]  "Although we treat decisions of the Third Circuit as persuasive authority on questions of federal constitutional law, we are not bound by them."  *Commonwealth v. Hicks*, 208 A.3d 916, 936 n.13 (Pa. 2019).

Contrary to *Dennis*, this Court has continued to repeat the legal premise that there is no *Brady* violation where the defendant could have known of such evidence with due diligence. In *Commonwealth v. Hannibal*, 156 A.3d 197, 210-11 (Pa. 2016), this Court stated that evidence that corrections' records were available by subpoena would defeat a *Brady* violation. Candidly, I question our reasoning, though I believe it was inconsequential in that matter because we had resolved the *Brady* claim first by finding that it was waived.

Regardless of *Hannibal*, I believe our recent decisions have correctly revealed that the foundations of this "fourth prong" are cracking. In 2020, we acknowledged but declined to apply the fourth prong to defeat a *Brady* claim. *Commonwealth v. Bagnall*, 235 A.3d 1075, 1091 (Pa. 2020) ("Under the circumstances of this case, we decline to hold that these pronouncements and the availability of transcripts from Gregory's criminal matter operate to defeat Appellant's claim."). And in 2023, we acknowledged that our case law is not consistent with that of the Third Circuit after *Dennis*, but avoided the issue and left it for another day. *Commonwealth v. Conforti*, 303 A.3d 715, 726 n.8 (Pa. 2023).

I would not recite (let alone apply) our language from *Paddy*, drawn from *Starusko*, and overruled in *Dennis*, until we address the tension between imposing such a requirement on a defendant to establish a violation of a prosecutor's duty that is otherwise absolute. *See, e.g., United States v. Agurs*, 427 U.S. 97, 107 (1976) ("[I]f the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made."). As the High Court has stated, "A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 696 (2004).

Thus, I do not join the Majority's recitation of the *Brady* standard insofar as it imposes a fourth prong, a reasonable diligence requirement, to establish a *Brady* violation, nor its finding that the Commonwealth had no duty to disclose the corrections file related to its key witness in this case.

Justice McCaffery joins this dissenting opinion.